ROYALS v. PIEDMONT ELECTRIC REPAIR CO., 1999 NCBC 1

| | |
|---|---|
| THE STATE OF NORTH CAROLINA<br>GUILFORD COUNTY | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION<br>97 CVS 720 |

JAMES L. ROYALS, JR., CARL F. BENFIELD, Co-Executors of the Estate of A.G. Draughan, Deceased,

        Plaintiffs

v.

PIEDMONT ELECTRIC REPAIR COMPANY, a North Carolina corporation, ROBERT G. DRAUGHAN, SR., and F.W. SHORT,

        Defendants

v.

NANCY A. DRAUGHAN, JAMES L. ROYALS, JR., Administrator of the Estate of Betsy Draughan Hackler, JUDY DRAUGHAN PHILLIPS, PEGGY DRAUGHAN HULIN, JAMES L. ROYALS, JR., (Individually), ROBERT G. DRAUGHAN, JR., DAVID MICHAEL DRAUGHAN, and STEVEN D. COE,

        Third-Party Defendants

**ORDER AND JUDGMENT**

{1} This matter came on for trial before the undersigned without a jury based upon the submissions of the parties. The Court, having reviewed the entire record, including the depositions, the valuation of the independent court appointed expert and the submissions of counsel, makes the Findings of Fact and Conclusions of Law set forth below. Judgment is entered ordering dissolution of Piedmont Electric Repair Company, Inc. pursuant to N.C.G.S. § 55-14-30(2)(ii) subject to the corporation's rights under N.C.G.S. § 55-14-31(d) to purchase the shares of the complaining minority shareholders at fair value.

> *William E. Wheeler, Wyatt, Early, Harris and Wheeler, L.L.P., attorneys for Plaintiffs and Third Party Defendants Nancy A. Draughan, James L. Royals, Jr. Administrator, Judy Draughan Phillips, Peggy Draughan Hulin, and James L. Royals, Jr., Individually*
>
> *Jan H. Samet, Keziah, Gates & Samet, L.L.P., attorneys for Piedmont Electric Repair Company, Inc.*
>
> *Robert A. Brinson, Roberson Haworth & Reese, attorneys for Robert G. Draughan, Sr.*
>
> *Rick Cornwell, Fisher Gayle Clinard Craig & Lackey, P.A., attorneys for F.W. Short*

# FINDINGS OF FACT

{2} 1. On or about June 8, 1993, A. Glenn Draughan ("A.G. Draughan") duly executed a Last Will and Testament which was later amended by a duly executed Codicil dated December 9, 1993 (the "1993 Will") by which at his death he bequeathed his stock in Defendant Piedmont Electric Repair Company, Inc. ("PERCO") to Plaintiffs as trustees under a testamentary trust for the benefit of his wife for life, and then his four daughters. A.G. Draughan died on July 4, 1996, at the age of 86. At the time of his death, A.G. Draughan was a citizen and resident of High Point, Guilford County, North Carolina. The 1993 Will was duly admitted to probate by the Clerk of Superior Court of Guilford County, High Point, North Carolina, on July 9, 1996 (Case No. 96 E 327). A.G. Draughan was survived by his widow, Maude W. Draughan ("Mrs. Draughan"), who is a citizen and resident of High Point, Guilford County, North Carolina. A.G. Draughan was also survived by five children, to wit:

> Robert G. Draughan, Sr. ("Buck"), age 21+
> Nancy A. Draughan ("Nancy"), age 21+
> Betsy Draughan Hackler ("Betsy"), age 21+ (deceased on February
> 15, 1998)
> Judy Draughan Phillips ("Judy"), age 21+
> Peggy Draughan Hulin ("Peggy"), age 21+.

A.G. Draughan was also survived by several grandchildren, among whom are:

> Robert G. Draughan, Jr. ("Bobby"), Buck's son, age 21+;
> David Michael Draughan ("Mike"), Buck's son, age 21+;
> James L. Royals, Jr. ("Royals"), Judy's son,
> A.G. Draughan's co-executor and Plaintiff and
> Third -Party Defendant herein as well as
> administrator of the Estate of Betsy Draughan
> Hackler, Deceased, Third-Party Defendant herein, age 21+.

{3} 2. Plaintiffs are the duly appointed co-executors of the 1993 Will, and are currently administering A.G. Draughan's estate pursuant to the provisions of the 1993 Will. Plaintiff Royals is a citizen and resident of Guilford County, North Carolina; Plaintiff Carl F. Benfield ("Benfield") is a citizen and resident of Davidson County, North Carolina.

{4} 3. PERCO is a corporation duly organized under the laws of the State of North Carolina whose principal place of business is located in High Point, Guilford County, North Carolina.

{5} 4. Defendant Buck Draughan is a citizen and resident of High Point, Guilford County, North Carolina.

{6} 5. Defendant F.W. Short ("Short") is a citizen and resident of High Point, Guilford County, North Carolina.

{7} 6. Third-Party Defendants each own shares of stock in PERCO and have been joined as parties to this action by order of the Court dated February 9, 1998 so that a complete determination of the rights of all shareholders in PERCO can be properly made. Plaintiffs and the third-party defendants Nancy Draughan, Judy Phillips, Peggy Hulin and James Royals are collectively referred to herein as the "complaining minority shareholders."

{8} 7. The summons and pleadings in this action have been duly and properly filed and served upon all parties, and the Court has jurisdiction over the subject matter of and parties to this action. This action came on for trial before the undersigned, upon due and proper notice to all parties, on September 14, 1998, after trial by jury had been waived by all parties.

{9} 8. PERCO is a closely held corporation. It currently has 990 issued and outstanding shares of

corporate stock. With the exception of the 49 shares of Steve Coe, an employee of PERCO, all shares in PERCO are owned by children and/or grandchildren of A.G. Draughan. The shareholders of PERCO and the number of shares held by each of them, respectively, are as follows:

| SHAREHOLDER | NUMBER OF SHARES |
|---|---|
| Buck | 506 |
| Short | 1 |
| Mike | 49 |
| Steve Coe | 49 |
| A.G. Draughan's Estate | 380 |
| Nancy | 1 |
| Judy | 1 |
| Peggy | 1 |
| Royals, Individually | 1 |
| Royals as Administrator of the Estate of Betsy | 1 |
| **Total Number of Shares** | **990** |

{10} 9. Royals is A.G. Draughan's grandson, and Benfield was his former business partner and good friend for over 50 years.

{11} 10. The 380 shares currently owned by A.G. Draughan's estate represent slightly more than 38% of PERCO's shares. Buck's 506 shares in PERCO represent slightly more than 51 % of the company's stock.

{12} 11. PERCO was incorporated in 1937 and since that time has been engaged in the electrical contracting business. A.G. Draughan was employed by PERCO from 1938 until 1994. He has been described by those who knew him from the beginning as "the backbone of PERCO" and "the man that was behind the Company's growth." He was its president until 1989 when he stepped down to the position of vice-president in favor of his son, Buck, who then became president. Short is the executive vice-president and secretary of PERCO and is A. G. Draughan's nephew as well as Buck and Royals' cousin. Buck and Short both went to work at PERCO in 1951. At that time, 50% of the shares in PERCO were owned or controlled by A.G. Draughan and 50% were owned or controlled by Short's father, Dan Short. In 1958, A.G. Draughan sold one share to Buck. Through a later recapitalization, that one share was converted to 55 shares. Also in 1958, Dan Short retired and sold his 50% interest in PERCO to his son, Short, in order to fund Dan Short's retirement. Sometime in the 1970s, A.G. Draughan and Short conveyed to Buck, as a gift, an additional one share each, which through the subsequent recapitalization became 110 shares, giving Buck a total of 165 shares in PERCO at that time. No shares in PERCO thereafter changed hands until 1994.

{13} 12. On June 5, 1980, all the then shareholders in PERCO (i.e., A.G. Draughan, Buck and Short) entered into a signed and written agreement restricting the sale of PERCO's stock (the "1980 Restriction"). That restriction imposed a right of first refusal by the corporation and by all other shareholders before any of the corporation's stock could be sold. On November 28, 1989, those same shareholders amended the 1980 Restriction by signing a new shareholder resolution requiring a selling shareholder to offer the stock in PERCO which he might propose to be sold first to the corporation or to another shareholder (unless devised by Will to another shareholder) (the "1989 Restriction").

{14} 13. The relationship between A.G. Draughan and Defendants began to deteriorate in 1992, when information came to Defendants' attention suggesting one or more female employees of PERCO had complained that A.G. Draughan had engaged in activity which might constitute sexual harassment. Independent counsel was employed by PERCO to investigate these allegations. The report of the

investigation concluded that Mr. Draughan had committed acts which could constitute sexual harassment which had the purpose or effect of interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment.

{15} 14. On February 1, 1993, Buck, as president of PERCO, wrote to A.G. Draughan requesting A.G. Draughan withdraw from PERCO's group health insurance program and instead enroll in an AARP insurance program at A.G. Draughan's expense. The stated purpose for Buck's request was to save PERCO money. In doing so, Buck wrote to his father, "your refusal to enroll in this [AARP] program could amount to breach of your fiduciary duty as a director of [PERCO] to the shareholders and employees of the company." A.G. Draughan responded with a willingness to do as Buck requested provided the coverage for himself and Mrs. Draughan (Buck's mother) under PERCO's group plan stay in place for three months after A.G. Draughan enrolled in the AARP insurance program in order to eliminate any coverage issue with regard to pre-existing conditions. Buck refused A. G. Draughan's request.

{16} 15. In May of 1993 a second investigation of alleged sexual harassment by A.G. Draughan of the employees of PERCO was conducted by an independent law firm. On May 18, 1993, Buck and Short, as president and vice-president/treasurer of PERCO, respectively, wrote to A.G. Draughan barring him from the motor shop at PERCO. At that point, anger and distrust between A.G. Draughan and Defendants began to replace the relatively good relationship they had enjoyed prior to 1992.

{17} 16. As a result of the second investigation and upon advice of counsel for the company, on June 4, 1993 PERCO again wrote to A.G. Draughan, this time barring him from the premises altogether. In that letter, they advised A.G. Draughan that he would continue as a "consultant" to PERCO with an annual salary of $15,000. From 1980 to 1991, A.G. Draughan's annual compensation had averaged in excess of $42,000. In 1982, A.G. Draughan had executed a will (the "1982 Will") leaving all his stock in PERCO to Buck, provided Buck paid certain money to his estate for the benefit of A. G. Draughan's wife and four daughters. The money Buck was to pay was well below the value of the stock he was to receive. Buck had been aware of the terms of the 1982 Will. However, after receiving the letter of June 4, 1993 barring him from the PERCO premises and reducing his annual compensation to $15,000 per year, the next day A.G. Draughan changed the 1982 Will, leaving all his stock in PERCO to the testamentary trust of which Plaintiffs are trustees. A.G. Draughan made no provision for Buck in his June 5, 1993 Will.

{18} 17. On June 7, 1993, A.G. Draughan offered to sell his stock to PERCO, or to Buck and Short, at a price equal to 120% of the corporation's book value as provided for in the 1989 Restriction. Buck and Short, individually and on behalf of PERCO, declined to purchase A.G. Draughan's stock pursuant to the terms of the 1989 Restriction. A.G Draughan subsequently gave one share each of his PERCO stock to Judy, Nancy, Peggy, Betsy and Royals, leaving A.G. Draughan with 380 shares. Thereafter, A.G. Draughan (and later Plaintiffs as his executors) and Buck/PERCO engaged in negotiations and made offers and counteroffers related to the possible sale of A. G. Draughan's then 380 shares (approximately 39%) in PERCO to either Buck or to the corporation, which negotiations continued up to and after the time this action was filed. However, no agreement was ever reached.

{19} 18. A.G. Draughan made it known that he needed the money from the sale of his stock in PERCO to fund his retirement, much as his former partner, Dan Short, had done in 1958. A.G. Draughan told Benfield that he needed Benfield to sell his stock after his (A. G. Draughan's) death in order to fund his testamentary trust for the benefit of his wife and daughters.

{20} 19. On February 7, 1994, Short sold 340 of his then remaining 440 shares in PERCO to Buck in order to fund his retirement. Short did not first offer the 340 shares, or any portion thereof, to either the corporation or to A.G. Draughan. With the acquisition of the 340 shares from Short, Buck became the owner of 505 shares in PERCO (51%). Neither A.G. Draughan nor any representative thereof was aware of Buck's purchase of the 340 shares from Short until after that sale was consummated. Short subsequently sold 33 of his remaining 100 shares in PERCO to Buck's son, Mike, another 33 shares to Buck's son, Bobby, and another 33 shares to Steve Coe. The purpose of this sale was to further fund

Short's retirement. Prior offer or notice of these sales was not given to the corporation or to Plaintiffs. Since that time, Bobby has sold or given one of his 33 shares to Buck, and sold 16 shares to Mike and another 16 shares to Coe. Prior offer or notice was not given to the corporation or to Plaintiffs of the sale of those shares.

{21} 20. In February 1994, A.G. Draughan was 83 years old and in poor health. As a result, at a shareholders' meeting on February 10, 1994, by and through A.G. Draughan's proxy and the cumulative voting of A.G. Draughan's then 385 shares, Royals was elected as one of three directors of PERCO. The other two directors were Buck and Short. At a session of a directors' meeting later that day, Buck and Short elected themselves as a two-member executive committee to run the company. At the February 10, 1994 board meeting, PERCO offered to purchase A.G. Draughan's then 385 shares for $330 per share. The book value of PERCO's stock at that time was approximately $719 per share. That offer had a 15-day deadline and would expire on February 25, 1994 if not accepted by A.G. Draughan. The day after that meeting, February 11, 1994, Buck wrote to A.G. Draughan on behalf of the two-man PERCO management committee firing A.G. Draughan as vice-president of PERCO, terminating him as a consultant for the company, and advising him that no further compensation would be paid to him by PERCO. The sexual harassment allegations previously referred to were unrelated to termination of A.G. Draughan's employment. Buck acknowledged that A.G. Draughan was fired and his compensation terminated the day after PERCO made the $330 per share offer to purchase A.G. Draughan's stock, but claims A.G. Draughan's firing was not part of a negotiating ploy to purchase A.G. Draughan's stock in PERCO. After his termination in 1994, A.G. Draughan was paid nothing further by PERCO. Buck was aware at that time that A.G. Draughan's only source of income was his social security. Buck was also aware that A.G. Draughan's social security may not have been enough for him to live on. PERCO's February 10, 1994 offer to purchase A.G. Draughan's stock for $330 per share expired on February 25, 1994 without being accepted by A.G. Draughan.

{22} 21. Subsequent to February 11, 1994, the relationship between A.G. Draughan and Defendants deteriorated further. Communications were strained. A.G. Draughan was hired by his friend Benfield as a consultant at $10,000.00 per year because Benfield was aware of A.G. Draughan's financial situation and felt sorry for him.

{23} 22. After February 10, 1994, management of PERCO was conducted exclusively by the two-man executive committee made up of Buck and Short without any consultation with either A.G. Draughan, as owner of approximately 39% of the shares in PERCO, or with Royals, one of its three directors. A.G. Draughan began telling people in the community that Buck and Short had stolen his company from him. Buck would not allow A.G. Draughan or Royals on the PERCO premises for any purpose, and A.G. Draughan barred Buck from A.G. Draughan's home. A significant and growing attitude of mistrust and family discord flourished. On July 4, 1996, A.G. Draughan died. Since that time family discord has continued, principally between Buck and his four sisters (A.G. Draughan's four daughters who owned one share each in PERCO).

{24} 23. Royals and Benfield's only interest in the matter was an effort to end the discord by selling A.G. Draughan's shares to PERCO or to Buck (including the 5 shares previously conveyed by A.G. Draughan to Royals and A.G. Draughan's daughters). Buck asserts, without any supporting evidence, that Royals was providing confidential information concerning PERCO to various persons throughout the High Point community, notwithstanding Royals' written assurances to the contrary. Defendants can identify no confidential information allegedly provided by Royals, nor any person in the High Point community outside PERCO to whom such information was allegedly provided by Royals. Defendants have asserted, without any supporting evidence, that Benfield has been, and currently is, attempting to purchase A.G. Draughan's shares in PERCO, and/or PERCO itself, notwithstanding Benfield has made it clear, not only to Defendants, but to A.G. Draughan before his death and to his personal lawyer, Arch Schoch, as early as 1993, that Benfield neither had nor has any such interest. Benfield owns and operates a similar business in another county.

{25} 24. Defendants have excluded representatives of A.G. Draughan's shares from involvement in PERCO's management. In 1993, A.G. Draughan expressed concern for a possible environmental problem on real estate owned by PERCO in and around the company's offices and shops. Counsel for Buck advised A.G. Draughan's attorney, Arch Schoch, that PERCO had no intention of doing anything about the environmental problem and acknowledged failure to do so would no doubt have an adverse effect upon the value of A.G. Draughan's shares in PERCO. In February or March 1997, Royals, accompanied by an environmental engineer, attempted to review the site of the aforesaid environmental problem. Notwithstanding Royals is and was then a director of the Corporation, on March 5, 1997, Robert Sheahan, an attorney and assistant secretary of PERCO, wrote to Royals at the behest of Defendants warning that if he (Royals) or any other minority shareholder (i.e., A.G. Draughan's daughters, but not Buck's sons or Coe) came upon PERCO's premises in the future, they would be prosecuted for criminal trespass.

{26} 25. After the institution of this action, Mrs. Draughan advised the Plaintiffs that she did not approve of the lawsuit being brought.

{27} 26. Prior to the institution of this action, no statutory demand was ever made by the complaining minority shareholders upon the corporation to pay dividends.

{28} 27. PERCO has had no directors' or shareholders' meetings since 1996. All corporate activities normally conducted and reviewed by the shareholders and board of directors of PERCO since 1994 have been conducted exclusively by the two-man executive committee made up of Buck and Short to the complete exclusion of Royals, notwithstanding he continues to be a director of PERCO. Royals has been excluded from discussions concerning Defendants' compensation, bonuses, 401(K) contributions, dividends, etc.

{29} 28. The ownership interest in PERCO represented by A.G. Draughan's 385 shares of stock therein has been completely excluded from any voice in connection with the management of PERCO from 1993 to the present. There are no indications that this will change in the future. Since 1993, there has been neither close cooperation nor any degree of mutual respect or substantial trust between Buck and owners of the 385 shares in PERCO represented by A.G. Draughan's shares in the company, even after his death.

{30} 29. No claims based upon the allegations of sexual harassment by A.G. Draughan have been filed, and such claims are now time barred. If true, those allegations would have justified Defendants in terminating A.G. Draughan as an employee. However, his rights as a shareholder would not have been forfeited as a result. Plaintiffs have not asserted any claim for either monetary damages for violation of A.G. Draughan's employment rights or any claim for refusal to provide employment for any complaining minority shareholder. Plaintiffs' claim is that they now have a financial interest in PERCO (as did A.G. Draughan before them) and, as executors of A.G. Draughan's Estate, the right as substantial, albeit minority, shareholders in PERCO to have a voice in management of the Corporation, at least at the Board of Director level.

{31} 30. PERCO has never paid dividends. However, from 1969, and especially from 1989 until his employment was terminated in February 1994, A.G. Draughan had no real duties at PERCO, and what few services A.G. Draughan might have performed for the corporation during the hour or so per day he was at PERCO provided no real benefit to the corporation. Even so, PERCO continued to pay A.G. Draughan substantial compensation during that period. PERCO's records show that from 1980 through 1991, A.G. Draughan's annual taxable compensation from PERCO averaged in excess of $42,000. It appears that payments by PERCO to A.G. Draughan from 1969 until his termination in 1994 represented distribution of profits to him as a shareholder rather than compensation to him as an employee. Buck and Short were well aware of this practice and authorized it.

{32} 31. Buck was aware that A. G. Draughan's stock represented the bulk of his estate and that his only income after being fired from PERCO was his social security. Buck and PERCO were involved in ongoing negotiations to purchase A.G. Draughan's remaining 385 shares of stock in PERCO since prior to

1993, and have been negotiating with Plaintiffs since A. G. Draughan's death to purchase those shares.

{33} 32. Under the current situation, it is highly unlikely that A.G. Draughan's shares in PERCO, or those of Nancy, Judy, Peggy or Betsy's Estate, can ever be sold for their fair market value to anyone outside the current shareholders, nor will the investment in PERCO represented by those shares ever be realized absent such a sale. Accordingly, that investment is effectively and indefinitely imprisoned within the corporation to the benefit of Buck and to the detriment of Plaintiffs as executors of A.G. Draughan's estate and trustees of his testamentary trust. Since the company does not have strong growth potential, does not have management succession in place, and key management is nearing retirement age, there is a strong possibility that the value of minority shares will be diminished in the future.

{34} 33. Buck has made it clear that Plaintiffs, as well as other minority shareholders whose shares comprise some portion of the 385 shares formerly owned by A.G. Draughan, are unwelcome upon PERCO's premises. The tension between all the shareholders in PERCO leading up to and related to this litigation has now been going on for over six years and shows no signs of abating.

{35} 34. The holders of the 385 shares of stock in PERCO, representing approximately 39% of the ownership interest therein originally owned by A.G. Draughan, and after his death held by Plaintiffs as executors of his estate, as well as Judy, Betsy, Nancy, Royals and Peggy, had certain reasonable expectations which are set forth below. These reasonable expectations, which were known or assumed to exist by Defendants, have been frustrated without the fault of the complaining minority shareholders.

> a. Meaningful participation in the management of PERCO, at least at the Board of Director level;
>
> b. Close cooperation, a high degree of good faith, mutual respect and substantial trust between the majority and minority shareholders in management of PERCO;
>
> c. Royals, as the director elected by those shares, would have a voice in business decisions of the corporation and access to its financial and business records prior to decisions being made;
>
> d. The value of A.G. Draughan's shares in PERCO would be available for his retirement and/or to fund his estate plan;
>
> e. They would have a reasonable opportunity to realize some return upon the value of their equity in the corporation represented by their shares in PERCO either by distribution of profits or by sale of their stock at its fair market value;
>
> f. The shares would not be held captive and be subject to coercion of a bargain sale.

{36} 35. The adjusted book value of all shareholders' equity in PERCO as of March 31, 1996, was $926,613 ($935.97 per share), and it has increased since that time. At the end of the 1998 fiscal year, PERCO had 42 full-time employees and a total payroll of $1,067,966.15. During that year it serviced 949 customers, purchased over $2,000,000 from 348 suppliers and had total sales of $3,036,055.90.

{37} 36. The salaries paid to Buck Draughan and the other officers were not excessive, nor were their 401(k) contributions. There has been no abuse in the use of company automobiles by the officers. The employment of family members was not inappropriate.

## OPINION AND CONCLUSIONS OF LAW

{38} Based on the foregoing Findings of Fact, the Court must determine two issues as a matter of law. First, the Court must determine whether the Plaintiffs have established that their rights and interests as shareholders have been contravened and that, balancing all of the interests involved, the Court should order the corporation dissolved pursuant to N.C.G.S. § 55-14-30(2)(ii). If the Court so orders, N.C.G.S. § 55-14-31(d) provides that the company has the right to avoid dissolution by purchasing the complaining minority shareholders' shares at "fair value" as determined by the Court. The determination of fair value is the second issue which the Court will address.

{39} The analysis which must be applied by the trial court in determining whether a complaining minority shareholder is entitled to involuntary dissolution or to alternative relief is set forth in *Meiselman v. Meiselman,* 309 N.C. 279, 307 S.E.2d 551 (1983). That determination in the factual context of this case is a difficult one. This is not a clear cut case where shareholders are being denied basic rights such as voting rights and inspection rights or the company is being mismanaged by the majority shareholders. Rather, this case revolves around the particular relationships and circumstances of this situation and the nature of this business. The Court has considered the factors set forth below in reaching its decision on dissolution.

{40} *The original expectations of the parties.* There is little doubt that A.G. Draughan originally intended that his son Buck would purchase A.G.'s shares of stock at a bargain price and provide for A.G.'s retirement through salary from the company. The manner in which the Shorts had transferred stock between father and son and even the arrangement between Buck and F.W. Short evidence a consistent pattern of the corporation's succession and retirement planning. A.G. Draughan's 1982 Will is further evidence of his original expectation with respect to his relationship with the company and his son. The fact that A.G. Draughan had been paid a salary without making a significant contribution to the management of the company before the sexual harassment claims arose and was paid a consulting fee even after he was barred from the premises strongly supports a finding that he had a reasonable expectation of continuing income from the company and that the company recognized that expectation. The fact that A.G. Draughan had made no other provision for retirement income is also significant. It is equally clear that both Buck and A.G. Draughan had an expectation that Buck would ultimately own A.G.'s stock in PERCO. They had discussed the terms of the original 1982 Will. Buck was running the company and Short had no children in the business. It was logical that Buck would one day become the majority or sole owner. For his part, Buck had an expectation that he would purchase his father's stock at a bargain price. Buck's siblings had no involvement in the business.

{41} *The intervening factor of the sexual harassment allegations.* There is no question that the company was faced with a difficult situation when the harassment allegations were made against A.G. Draughan. He was elderly at the time and not playing a vital role in the management of the business. His actions, if the allegations were truthful, subjected the company to potential liability of a significant nature. The company had no choice but to take some action to protect both the company and A.G. Draughan from liability. The original actions taken were reasonable and based upon the recommendations of counsel. It was prudent to first ban Mr. Draughan from certain areas and then from the entire premises. While Mr. Draughan's behavior would have justified removing him from an active management position, it is clear that his compensation at that time was not related to the services he was performing. Thus, while Mr. Draughan's behavior might have constituted a legally permissible excuse for the company's failure to fulfill an expectation for continued participation in management, the Court concludes that it did not serve as an excuse for cutting off his compensation.

{42} *The destruction of the original expectations of both sides.* Both sides to the controversy between A.G. Draughan and the company controlled by his son bear some responsibility for the failure to follow through on the original plan for the transition in ownership and control of the company. Mr. Draughan committed acts which required action on the part of the company to protect the company and its employees. Mr. Draughan's age, while it might be an explanation, is not an acceptable excuse for those actions. By cutting off Mr. Draughan's only source of income other than social security, Buck Draughan and the company could not have reasonably expected Mr. Draughan to fulfill the original plan to will his stock to Buck in return for a bargain payment to Buck's sisters. Mr. Draughan was in a position where he

could conceivably be coerced into selling his stock for less than fair value. The further actions of the company in insisting that Mr. Draughan give up his insurance benefits could only be interpreted as additional coercion to get Mr. Draughan to sell his stock. Buck, in an effort to insure his control of the company, opted to purchase Short's shares rather than his own family's shares. Short was able to sell his shares and get the kind of retirement payout that his father had received and which A.G. Draughan had expected. In summary, the parties to the original expectation had each contributed to a situation which made fulfillment of the original plan impossible.

{43} *The status of the current minority shareholders.* The death of A.G. Draughan without resolution of the conflicts with his son and the company meant that his shares passed to the trust set up for the benefit of his wife. The trust prevented Buck from purchasing the shares at the bargain price contemplated in Mr. Draughan's original will. The trustees of that trust have a fiduciary duty to maximize the assets and income of the trust for the benefit of both the income beneficiary, A.G. Draughan's widow and Buck's mother, and the remaindermen, Buck's sisters. They have a need to close out the administration of the estate and fund the trust in order to provide income to Mrs. Draughan. Although the record is not completely clear, it appears to the Court that Mrs. Draughan, like her husband, has no source of income other than social security. It is unlikely that the trustees could find any purchaser for the trust's minority interest. The trust then is in a position where it could conceivably be coerced into a sale at less than fair value if it is ever to provide any benefit for Mrs. Draughan. By withholding any distribution to shareholders, Buck Draughan has deprived his mother of potential income from the trust. That is a significant factor in the court's consideration of whether this company can be operated for the benefit of all the shareholders. If Buck is unwilling to make any distribution which would benefit his elderly mother, it is unlikely that his attitude towards his sisters will be any better. While the ownership of the shares by an estate or trust is not enough in and of itself to justify an order of dissolution, the facts of this particular situation support a finding that the company will not be operated with any consideration for the interest of the minority shareholders.

{44} *The nature of the business.* This business is, at its core, a personal service business. It is dependent for its success on the personal contacts and relationships built up over the years by first A.G. Draughan and Dan Short and then Buck Draughan and F.W. Short. The business is not one that is likely to experience any explosive growth given its nature and its location. It is subject to cyclical downturns in the economy. While the salaries, particularly that of Buck Draughan, are justifiable given his value to the business, that fact insures that, absent a change in Buck Draughan's attitude, there is no reasonable prospect that the minority shareholders will ever receive any dividend distribution or return on their equity in the business. Other factors also indicate that the equity of the minority shareholders is at risk. Buck is nearing normal retirement age and Short has passed it. Buck's children who were working in the business have left. There is no natural succession in either management or ownership of the business. One very likely scenario is that Buck will simply work as long as he chooses and then shut the business down and liquidate its assets, thus reducing the long term potential value of the interests of the minority shareholders while maximizing his income from the business in the interim. The liquidation value of the business would be less than the value of the business if sold as an ongoing concern. Thus, all the shareholders will suffer some loss if dissolution is ordered.

{45} *The impact on employees and others.* Dissolution of the business will cost many employees their jobs and will disrupt relationships with suppliers, customers and creditors. The impact on innocent third parties is a factor which the Court must consider. *See* Comment, *Oppression of Minority Shareholders: A Proposed Model and Suggested Remedies*, 47 Miss. L.J. 476, 496-97 (1976).

{46} *The relationship between the parties.* Throughout this litigation the parties, though all related, have demonstrated a mutual distrust and inability to resolve their differences. The problems in the relationships seem to extend beyond business to personal issues, some relating back to the decisions made by the company after the sexual harassment claims were made. Mrs. Draughan is caught in the middle. She has not been supportive of the litigation between her children. That is understandable. However, her desire not to be involved in litigation between her children does not relieve the trustees and executors of their

fiduciary duties and obligation to administer both the estate and trust.

{47} *Corporate actions following the death of A.G. Draughan.* The manner in which the corporate decisions have been made following the death of A.G. Draughan evidences an intent on the part of Buck Draughan and Short to exclude the minority shareholders from the business decision making process. While the minority shareholders have not been denied access to information about the finances of the business after the fact, and Royals can participate as a member of the Board of Directors, the establishment of the Executive Committee to make the day to day decisions on the operation and finances of the business clearly indicate an intention to exclude the minority shareholders from meaningful participation in the ongoing business decisions. In this case there does not appear to be any reason for establishment of the Executive Committee other than to exclude Royals, and thus the complaining minority shareholders, from any decision making process. While minority shareholders may not have a right to a management position in the company, where they hold a sufficient interest to elect a director, this Court believes they are entitled to something more than an *ex post facto* knowledge of what has happened in the business. It is also clear that there is a danger in this situation that Buck Draughan will simply conduct the business to suit his own purposes until he retires, and Mr. Short is paid out, without doing anything which would result in the minority shareholders receiving any return on or increase in value in their equity in the business. Prior to A.G. Draughan's dismissal from the company, he had received what was, in effect, a return on his equity in the form of compensation and/or consulting fees for very little in the way of services. Since Mr. Draughan's dismissal in February 1994 neither he nor his heirs have received any distribution from the company.

{48} The Court concludes that the business of PERCO is being conducted to the unfair advantage of one shareholder or group of shareholders. See *Foster v. Foster Farms, Inc*. 112 N.C. App. 700, 708, 436 S.E.2d 843, 848 (1993); *Benchmark Carolina Aggregates, Inc. v. Martin Marietta Materials, Inc.,* 125 N.C. App. 666, 482 S.E.2d 27 (1997), *disc. rev. denied* 346 N.C. 275 (1997).

{49} Accordingly, the Court concludes as a matter of law that the combination of the failure of the original expectations of A.G. Draughan with the actions of the current majority shareholders in denying the reasonable expectations of the current minority shareholders, as well as the particular circumstances of this business and its management, warrant this Court's finding that liquidation is reasonably necessary for the protection of the rights and interests of the complaining minority shareholders and within the Court's discretion and equitable powers to afford the complaining minority shareholders the relief provided by N.C.G.S. § 55-14-30(2)(ii).

{50} Having made the determination that dissolution is appropriate, the Court next turns to the alternative relief provided to the corporation under N.C.G.S. § 55-14-31. That statute permits the corporation, at its election, to purchase the shares of the complaining minority shareholders "at their fair value, as determined in accordance with such procedures as the court may provide." N.C.G.S. § 55-14-31(d).

{51} In this case, the parties, at the suggestion of their counsel, wisely agreed to have an independent, objective and experienced business appraiser prepare a valuation of the company. Pursuant to the Court's direction, George Hawkins, ASA, CFA of Banister Financial, Inc., prepared an excellent and thorough valuation of the company and its businesses in a report dated August 26, 1998 and accompanying letter dated August 27, 1998 (the "Banister Valuation"). The Court has relied heavily on the Banister Valuation in its determination of fair value, but has also made its own assessment of fair value based upon its own review of the record, the undisputed information in the Banister Valuation and the arguments and submission of counsel. Included in the Court's assessment of fair value are equitable factors which were not appropriate for the Banister Valuation.

{52} Neither the legislative history nor existing North Carolina appellate precedent offer any specific guidance to the trial courts in deciding either the procedures or standards to be used in determining fair value. In this case, the procedure to determine fair value is not a problem. The case has been submitted to the Court for determination without a jury and an independent appraisal by a court appointed expert has

been performed which will assist the Court in determining fair value.

{53} The term "fair value" is not defined in the statute nor does the statute provide any specific guidance with respect to the factors to be used in determining fair value. In order to facilitate any subsequent review of this Court's determination of fair value in this situation, the factors which the Court considered and those it omitted in reaching its determination are set forth below.

{54} *Market Value.* If the Legislature had intended for the valuation to be set at "fair market value," it could have and would have used that term. Instead, it chose to use a broader definition which gave the trial court more leeway in determining value for purposes of the alternative relief provided by the statute. In addition, the procedure for determining fair value was left to the Court's discretion. The broader definition and flexibility in procedure recognize that the circumstances surrounding the provision of equitable relief in the form of dissolution can vary widely. Business conditions can vary depending on the nature of the business. Even the timing of application of the relief could have an impact on valuation. Therefore, market value is not the sole determinant of fair value, but is a factor to be given heavy weight. It is the starting point for any valuation. In this case, the Banister Valuation provides a strong reliable indicator of market value.

{55} The Court places reliance on this particular valuation for a number of reasons. The valuation was prepared by an independent court appointed expert without any allegiance to any party. Mr. Hawkins is an experienced business appraiser with outstanding qualifications. He had access to all of the information he needed to prepare his evaluation and the full cooperation of counsel for all parties. In addition, peer industry information was available for this industry. The report was prepared in accordance with the *Business Valuation Standards* of the American Society of Appraisers and the *Uniform Standards of Professional Appraisal Practice.* The studies and data relied upon were up to date and commonly used references. The evaluation set forth clearly and in detail the positive and negative factors considered, the limiting conditions and the methodology used in deriving the values. Those methodologies were generally accepted methodologies for this type of evaluation. Counsel for the parties had an opportunity to review an initial draft of the report and comment and raise questions.

{56} At the Court's request, Mr. Hawkins estimated the fair market value of the common shares of PERCO on a going concern basis using two separate assumptions. Under the first assumption, the minority shares are assumed equal to their prorata share of the 100% control value of the entire company. Under the second assumption, the minority shares are valued on their own and are thus discounted for the lack of control (a minority discount) and their illiquidity (lack of marketability discount). Under the first assumption, Mr. Hawkins valued the minority shares at $846.61 per share for a total value of $321,712. Under the second assumption, the minority shares were valued at $462.27 per share or a total of $175,663. The methodologies used in reaching both valuations were sound. Under the second valuation, Mr. Hawkins first determined the "minority, as if freely traded" value using a capitalization of earnings approach. That approach is based upon a determination of the value of the shares as if they were minority share interests and freely traded on a stock exchange. That value came to $732.32 per share. He then added $38.13 per share which represented the value of nonoperating assets which were not taken into account in the minority as if freely traded approach, to come to a total of $770.45 per share. He then prepared a thorough analysis of numerous factors affecting the marketability of the shares to arrive at a 40% discount for lack of marketability. Applying the 40% discount resulted in the $462.27 valuation. If discounts for lack of control or marketability are applicable, Mr. Hawkins' determination of both discounts was not unreasonable under the circumstances of this case.

{57} *Applicability of discounts for lack of control and marketability.* The Court must decide whether, in determining fair value under these circumstances, it is appropriate to apply a discount for either lack of control or marketability. Clearly, if these plaintiffs set out to sell the minority shares on the open market, an arms length purchaser would discount the value based upon the lack of control and lack of marketability of the shares. However, where the Court has found that dissolution is an appropriate equitable remedy, it would be inequitable to then value the minority shares by giving them less than the

full value they would have if the company were sold and they received their prorata share of the total sales price. To do otherwise would provide a reward to majority shareholders who oppressed minority shareholders or chose to run the company for their own benefit without regard to the interests of minority shareholders. Under the statutory scheme, the complaining minority shareholders are <u>compelled</u> to sell their shares if the company elects to exercise its right to purchase them. The majority shareholders are thus in a position to have the company buy the shares which could then be resold with the majority shares at a value based upon 100% control value. They should not be allowed to buy at a discounted price that which they could immediately turn around and resell at full value. The statute clearly does not contemplate such a windfall for majority shareholders, nor should it be interpreted in such a way as to provide an incentive for majority shareholders to oppress minority shareholders and force them to sell. The Court believes that North Carolina law does not favor application of discounts for lack of control or lack of marketability under these circumstances and will not apply discounts in this case.

{58} *Objections to valuation raised by the parties.* Counsel for the parties were provided with preliminary drafts of the Banister Valuation and given the opportunity to raise questions or provide additional input. All parties took advantage of that opportunity. Mr. Hawkins responded to the questions raised in his letter dated August 27, 1998. The Court has carefully reviewed Mr. Hawkins' response and the positions taken therein in which he declined to change the valuation. The Court agrees with the positions taken by Mr. Hawkins in his response and finds that at that time there was no need to change the valuation he reached based upon the issues raised by counsel.

{59} *Other factors affecting fair value determination.* The determination of fair value is not limited to a valuation based solely upon market value. If that were the case, the value per share of the complaining minority shareholders' shares would be $846.61. In *Meiselman*, the North Carolina Supreme Court first recognized that valuations of minority shares in small closely held companies required a different approach than valuations involving large publicly traded companies for which readily ascertainable market values were available and constituted reliable indicators of value. Minority shareholders in publicly traded companies have a market for their shares and thus do not need the remedy of compulsory purchase by the company or its majority shareholders. The *Meiselman* decision recognized that North Carolina was home to many family-owned textile, furniture and retail companies and that the state courts had historically protected the rights of minority shareholders in those corporations. The decision also recognized that there existed a greater possibility of disproportionate benefits between majority and minority shareholders in closely held companies. It is also true that in many instances involving family owned businesses, not all of the children of the founder may join the company and contribute to its success. Frequently, as here, one child may assume the responsibility of management succession and other children may not be involved in the business at all. Often, owners of small businesses operate more like partnerships than corporations. Depending on the circumstances, "fair value" of a minority interest could be greater than "market value" or could be less. Each situation represents a unique set of facts for valuation purposes. The equitable nature of relief requested by the complaining shareholders requires flexibility, and the statute provides that flexibility. In this situation, the Court has considered a number of factors in addition to market value in reaching its decision on fair value.

    a. <u>Changes in condition</u>. At the time the Banister Valuation was prepared, Buck Draughan's sons were involved in the business and there appeared to be the possibility of a clear succession plan which would keep the business going. After the valuation was prepared both sons left the business. Short is past retirement age. Buck is approaching it. The risk factor from loss of key management in what is essentially a personal services business has increased, as has the possibility that Buck Draughan will simply run the business until he retires and then dissolve it.

    b. <u>Equitable considerations</u>. Although the Court has found that the actions of the majority shareholders warranted the imposition of the equitable remedy provided by the statute, there are equitable factors to be considered in determining fair value under all the circumstances. Buck Draughan was not solely responsible for the failure of the original plan of succession and buyout. A.G. Draughan precipitated the crisis. Buck had put considerable effort into building up the business and much of

the success of the business in the recent past was attributable to his efforts. He had done so with a reasonable expectation that he would inherit his father's stock or purchase it at a bargain price. In addition, A.G. Draughan had received significant benefits from the understanding with his son. He had been paid salary and consulting fees at times when he was not performing any significant services for the company. On the other hand, it has been many years since the minority shareholders received any return on their equity in the business. While it is clear that the present minority shareholders should not have their equity held hostage by the majority shareholders to coerce a bargain buyout, it is also clear that none of them had any expectation of working in the business or receiving anything other than a return on their equity or a buyout at a reasonable uncoerced price.

c. <u>Practical considerations</u>. The Court should not reach a determination of fair value without looking at the practical implications of that decision. The Court is cognizant of the nonbinding obligations which the company had to F.W. Short. Although Buck clearly purchased Short's stock to obtain majority control, the company and the other shareholders faced the need to buy those shares as Short reached retirement age. He had the same sort of expectations as A.G. Draughan, and the company would not have been well served by forcing him to sell his shares to an outsider. Buck Draughan thus faces the potential of having to fund, individually or through the company, the purchase of a significant majority of the shares of the company from the other shareholders in a relatively short period of time.

A fair price is not one which automatically results in dissolution. The funds for purchasing the minority shareholders' interests must come from borrowed funds or operating expenses. Each alternative affects the future profitability of the company and its ability to function. If the "market valuation" results in a price that makes purchase impractical or impossible, the Court should take that into consideration. If the Court in effect forces dissolution by the price it sets, and the minority shareholders would receive less in liquidation than they would at a price less than "market valuation," their interests may be better served by the fair value price which is greater than the liquidation price. In a service business like PERCO's, liquidation often results in significant diminution of the value of assets and increases in potential liabilities.

{60} Having considered the excellent Banister Valuation and the valuable information contained therein and the other factors set forth above, the Court finds as a fact and concludes as a matter of law that the "fair value" of the minority shares for purposes of the rights and remedies provided by N.C.G.S. § 55-14-31(d) is $635.00 per share for a total of $244,475 for 385 shares.

{61} The Court further concludes that under the statute and its inherent equitable powers, it has authority to set the terms under which the minority stock is purchased. A fair and reasonable purchase procedure should provide that the purchase price be paid 25% at closing and the balance paid in the form of a promissory note which provides that the remaining principal be paid in three equal annual installments. The note should be secured by fixed assets of the company having a value of twice the principal balance. The note should bear interest at the statutory rate and provide that the principal balance would become due and payable on a change in control of ownership of the business or a sale of a majority of its assets. The terms of the note and security agreement shall be subject to approval by the Court.

{62} Lastly, the Court concludes that the Plaintiffs' Third Claim for Relief (the shareholders' derivative claim for damages) should be dismissed.

{63} Wherefore, based upon the foregoing Findings of Fact and Conclusions of Law, it is hereby **ORDERED, ADJUDGED AND DECREED:**

1. Subject to the alternative relief provided below, Piedmont Electric Repair Company, Inc. should be dissolved pursuant to the provisions of N.C.G.S. § 55-14-30(2)(ii).
2. Pursuant to the provisions of N.C.G.S. § 55-14-31(d) Piedmont Electric Repair Company, Inc. shall have 15 days in which to decide whether to purchase the 385 shares of stock held by the

complaining minority shareholders. The purchase price is set at $635.00 per share. Closing shall take place within twenty (20) days of the election. The purchase price shall be paid 25% at closing and the remaining balance by a promissory note which provides that the principal shall be paid in three equal annual installments. The note shall bear interest at the statutory rate and be secured by a security interest in unencumbered fixed assets of the company having a value of twice the amount of the principal balance of the note. Payment of the principal balance will be accelerated on sale of controlling interest or a majority of the assets of the company.

3. In the event that Piedmont Electric Repair Company, Inc. elects to purchase Plaintiffs' stock, Plaintiffs are ordered to transfer said stock to the company upon the company's compliance with the terms of this order.

4. In the event that Piedmont Electric Repair Company, Inc. does not elect to purchase the Plaintiff's stock, counsel for Plaintiffs shall prepare and submit to the Court an order for dissolution and appointment of receiver within ten days of notice of the election. Counsel for Piedmont Electric Repair Company, Inc. and the individual shareholders shall have ten days from the date of the election to propose names of potential receivers to the Court.

5. The cost of the Banister Valuation shall be taxed as costs in this action and shall be paid by Piedmont Electric Repair Company, Inc. The parties shall each bear their own costs of this action.

6. Plaintiffs' Third Claim for Relief is dismissed.

7. The Court retains jurisdiction of this matter to enforce this order.


This 3rd day of March, 1999.