Vernon v. Cuomo, 2010 NCBC 5.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| WAKE COUNTY | 06CVS8416 |

PAUL VERNON and JOEL WILLIAMS,
individually and derivatively on behalf
TRIBOFILM RESEARCH, INC.,

                Plaintiffs,

    v.

JEROME CUOMO, VINAY SAKHRANI,
CHARLES TOMASINO, JOAN MARIE
CHIKLIS as Personal Representative of the
Estate of Charles K. Chiklis, ROBERT A.
MINEO, and TRIBOFILM RESEARCH, INC.,

                Defendants.

**ORDER & OPINION**

(Redacted Copy, Original Filed Under Seal)

{1}    This matter came on for trial without a jury based upon the submissions of the parties and the court-appointed valuation expert. The Court, having reviewed the evidence, has determined the fair value of Plaintiffs' TriboFilm Research, Inc. shares. The Court also has included an alternative determination of fair value were an appellate court to find the Court's first fair value arrangement inappropriate. Because this valuation contains confidential business information, the Court will file the original under seal and a redacted copy publicly.

        *Northen Blue, LLP by Samantha H. Cabe and David M. Rooks, III for Plaintiff Paul Vernon.*

        *Plaintiff Joel Williams, pro se.*

        *Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP by Addie K.S. Ries for Defendant TriboFilm Research, Inc.*

        *Mineo & Mineo by Robert A. Mineo for Defendants Robert A. Mineo and Joan Marie Chiklis.*

        *Defendants Jerome Cuomo, Vinay Sakhrani, and Charles Tomasino, pro se.*

Tennille, Judge.

# I.

## PROCEDURAL BACKGROUND

{2}     Plaintiffs Paul Vernon ("Vernon") and Joel Williams ("Williams") filed the Notice of Designation contemporaneously with the Complaint in Wake County on June 9, 2006.  On June 12, 2006, this action was designated a mandatory complex business case by Order of the Chief Justice of the Supreme Court of North Carolina, and subsequently assigned to the undersigned Chief Special Superior Court Judge for Complex Business Cases.

{3}     This matter was bifurcated for trial.  In February 2009, during a one-week bench trial, the Court considered Plaintiffs' claims for breach of fiduciary duty and frustration of reasonable expectations.  Based on the evidence presented at the first phase of the trial, the Court concluded that the individual Defendants had engaged in self-dealing.  They breached their fiduciary duties to TriboFilm Research, Inc. ("TriboFilm" or the "Company") and to Plaintiffs, and their dilution efforts frustrated Plaintiffs' reasonable expectations.  In view of these findings, the Court restored Vernon and Williams to their original ownership interest and invoked the statutory procedure for dissolution in order to protect the interests of all shareholders.  *See* N.C. Gen. Stat. § 55-14-30(2)(ii) (2009).

{4}     In accordance with section 55-14-31(d) of the North Carolina General Statutes, the Court gave TriboFilm the option to avoid dissolution by purchasing Plaintiffs' shares at fair value.  Specifically, the Court provided the following:

> TriboFilm shall have ten (10) days from the date of this Order to notify the Court of its election to purchase the shares of Vernon and Williams at fair value.  If it so elects, the parties will have thirty (30) days from the date of this Order to agree upon a Court appointed valuation expert and the terms of his engagement.  Absent agreement, the parties will have (90) days from the date of this order to complete discovery on valuation issues.

*Vernon v. Cuomo*, 2009 NCBC 6 ¶ 94(5) (N.C. Super. Ct. Mar. 17, 2009), http://www.ncbusinesscourt.net/opinions/2009_NCBC_6.pdf.  Three days after the Court entered this Order, TriboFilm exercised its buy-out rights by notifying the Court of its intent to repurchase Plaintiffs' shares.

{5}     The second phase of trial involved the remaining issue of valuation.  The parties designated Michael J. Pellegrino ("Pellegrino") to serve as the Court's independent valuation expert.  Pellegrino has been recognized as one of the world's leading experts in intellectual property ("IP") valuation.  He is the founder and president of Pellegrino & Associates, LLP ("P&A"), a boutique valuation firm that specializes in early stage IP valuations.[1]  The parties retained P&A to provide its opinion as to the value of TriboFilm's IP portfolio.[2]

{6}     The parties had the opportunity to provide input throughout the valuation process.  The parties were required to produce all material information relevant to the valuation.  Pellegrino interviewed the parties and had numerous telephone conversations and e-mail exchanges with them "to verify various facts and assumptions."  (Valuation Report at 23.)  Through this examination, Pellegrino gained "in-depth technical insight" into TriboFilm's "products, marketing, financing, development cycle, and development methodologies."  (Valuation Report at 23.)  He also consulted public resources and conducted independent research.

{7}     On September 4, 2009, Pellegrino submitted P&A's final appraisal and valuation report (the "Valuation Report" or the "Report") to the Court and to the parties.  The Report was filed under seal to protect TriboFilm's IP portfolio and other confidential information from public disclosure.

{8}     The Court gave all parties the opportunity to comment on the Valuation Report.  Vernon and Williams each submitted comments on September 21, 2009, and TriboFilm submitted comments on October 12, 2009.  After receiving all three sets of comments, P&A responded to the parties' criticisms in a letter to the Court.

{9}     On February 2, 2010 and February 3, 2010, the Court held a valuation hearing in Wake County at which it heard and considered evidence addressed to valuation and liquidation.  Defendants chose to present live testimony from Vinay Sakhrani ("Sakhrani"), the current vice president of TriboFilm, and Moon W. Suh ("Suh"), a statistics professors at North Carolina State University.  Plaintiffs chose

---

[1] Throughout this opinion, "Pellegrino" and "P&A" will be used interchangeably.
[2] TriboFilm's IP portfolio included the TriboGlide and StaClear technologies.

to present live testimony from Vernon, the former president and lab administrator for TriboFilm, and Williams, a former business consultant for TriboFilm.

{10}    The Court requested that Pellegrino, the court-appointed valuation expert, attend the hearing.  As communicated to counsel in the November 19, 2009 Notice of Hearing, the Court intended "to address questions for Mr. Pellegrino at the outset and permit counsel to examine him with respect to issues not already addressed in their comments."  Plaintiffs expressed a willingness to cover their share of the costs of Pellegrino's attendance; Defendants, however, refused to do the same.[3]  On account of this impasse, the Court did not require Pellegrino's attendance at the valuation hearing.[4]

{11}    With respect to the first phase of trial, the Court incorporates herein the findings of fact and conclusions of law contained in its March 17, 2009 Order.  The Court found then, and for purposes of this second phase finds again, that (1) both parties contributed to the development of TriboGlide and (2) both parties were at fault.  The only issues presently before the Court are those related to valuation.

II.

LEGAL STANDARD

{12}    As this Court previously observed, "[t]he term 'fair value' is not defined" in section 55-14-31(d) of the North Carolina General Statutes, "nor does the statute provide any specific guidance with respect to the factors to be used in determining fair value." *Royals v. Piedmont Elec. Repair Co.*, 1999 NCBC 1 ¶ 53 (N.C. Super. Ct. Mar. 3, 1999), http://www.ncbusinesscourt.net/opinions/1999%20NCBC%201.htm. A review of the legislative history, likewise, offers little guidance on what procedure or standards to follow.  *Id.* ¶ 52.  The language of the statute simply requires that fair value be "determined in accordance with such procedures as the court may provide."  N.C. Gen. Stat. § 55-14-31(d).

---

[3] On December 16, 2009, Defendants claimed they lacked the funds to pay their share of Pellegrino's hourly costs to appear at the valuation hearing.  However, it became apparent at trial that TriboFilm had executed a license agreement with **REDACTED** on November 9, 2009, which included an initial license fee payment of **REDACTED** to TriboFilm.  (Defs.' Trial Ex. 13, § 3.1.)
[4] At the valuation hearing, the Court allowed Plaintiffs to call Pellegrino as a witness (via conference call), but only after Defendants' statistician took the stand.

{13}   In *Garlock v. Hilliard*, the Court emphasized the discretionary nature of this determination: "The Legislature wisely provided for flexibility in determining fair value.  Recognizing that every situation will be different, the Legislature did not limit fair value to market value and did not place any limiting parameters on the factors to be considered in determining fair value."  *Garlock v. Hilliard*, 2001 NCBC 10 ¶ 69 (N.C. Super. Ct. Nov. 14, 2001), http://www.ncbusinesscourt.net/ opinions/2001%20NCBC%2010%20%28Garlock%20v.%20Hilliard%29.htm.  The need for flexibility is even greater when valuing collections of assets that have no reasonable comparable in the market, as is the case with IP portfolios.

{14}   This Court has determined fair value under section 55-14-31(d) in at least two prior cases.  In both *Garlock* and *Royals*, the Court relied heavily on an independent appraiser's valuation report but also took into account other equitable and practical considerations based on the arguments and submissions of counsel and matters of record.  *See id.* ¶¶ 70–84; *Royals*, 1999 NCBC 1 ¶¶ 51–61.  Other considerations in those cases included the applicability of discounts for lack of control and marketability and any changes that occurred after the valuation report was prepared.  *See Garlock*, 2001 NCBC 10 ¶¶ 77, 81; *Royals*, 1999 NCBC 1 ¶¶ 57, 59.  The Court will follow a similar approach here.

{15}   This case demonstrates the extreme difficulty in valuing a company which has no assets other than IP that is untested in the marketplace.  It demonstrates the necessity of having well-documented provisions in place for valuation upon departure of one or more individuals that participated in the development of the technology.  One of the key problems faced by the Court in this valuation process has been how to protect against a windfall by the majority shareholders if the technology proves to be extremely valuable while not requiring the majority to pay an initial price that may be too high if the technology is not adopted widely in the industry.  The high level of distrust between the parties and their inability to work together in any reasonable fashion are further complications.  In addition, TriboFilm entered into two license agreements after Pellegrino prepared the Valuation Report.

{16}   There is little doubt that the parties' inability to resolve their differences and the large expenditures on legal fees have seriously impacted the business development of the technology.  Each side has approached this litigation as if the TriboGlide technology will revolutionize the syringe industry.  That remains to be seen.

### III.
### THE VALUATION REPORT

{17}   The parties in this case were unable to reach any business resolution or agreement in any way.  Therefore, pursuant to the discretion afforded under section 55-14-31(d), the Court sought the assistance of an independent valuation expert in determining the fair value of Plaintiffs' shares of TriboFilm.  The parties selected Pellegrino to serve as the court-appointed valuation expert.  Pellegrino had extensive experience in the IP valuation field and outstanding qualifications.  (*See* Valuation Report at 88–94.)

{18}   The Court will begin its analysis of fair value by considering the Valuation Report that Pellegrino prepared.[5]  However, before doing so, the Court will digress briefly to address other evidence offered by Defendants.

{19}   Two weeks prior to trial, after it had become clear that Pellegrino would no longer be attending,[6] Defendants hired Suh, a statistics professor at North Carolina State University, to review P&A's Valuation Report.  At trial, Defendants called Suh as a surprise witness and introduced the written comments he had prepared.[7] Neither Plaintiffs' counsel nor Pellegrino had seen Suh's report or had the opportunity to respond.  For that reason, the Court permitted Pellegrino to testify by phone.  The Court allowed Suh's testimony and admitted his comments only for purposes of showing how they impacted Pellegrino's approach, not for purposes of valuation.

---

[5] Pellegrino's analysis, opinions, and conclusions were developed, and his report was prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.  (Valuation Report at 87.)
[6] Defendants refused to pay their share for Pellegrino's attendance claiming they could not afford it. As it turned out, they had money to pay for his attendance from a newly signed license agreement.
[7] Suh prepared his written comments on February 1, 2010 (one day before the valuation trial began).

{20} Defendants also introduced a discounted cash flow analysis. The Court, however, rejects this analysis. The Court is not convinced that TriboFilm will experience a shortfall over the next three years. Moreover, any losses that develop can be absorbed by decreasing the high salaries the individual Defendants set aside for themselves.[8] Robert A. Mineo practices law, Jerome Cuomo works at N.C. State, and Charles Tomasino is retired. Currently, Sakhrani is TriboFilm's only full-time employee, and even he can do other work. Defendants never identified or produced for examination as an expert the preparer of their discounted cash flow evaluation. The discounted cash flow analysis was admitted for the sole purpose of showing what information was available to Pellegrino when preparing his Report.

{21} There is no evidence of expert valuation before the Court other than P&A's Valuation Report, which the Court will now consider.

A.

THE APPROACH

{22} P&A's Valuation Report set forth clearly and in layman's terms the factors, limitations, assumptions, and methodologies used to determine fair value.

{23} P&A used statistical stochastic modeling "to account for unforeseen events and circumstance that influence value." (Valuation Report at 23.) When building its valuation models, P&A considered a number of factors: market acceptance, any previous license agreements with similar technologies, working capital, operating budgets, capital equipment requirements, revenue recognition policies, income tax rate, regulatory environment, product warranty returns and allowances, currency and country risks, discount rates, workforce considerations, and the relative size, growth, and trends in target markets. (Valuation Report at 33–43.) P&A also considered factors specific to IP valuation: sustainable competitive advantage, risk associated with the technologies, functional realization, active government patent protections, active trade secret protections, ease of infringement detection, attempts

---

[8] The individual Defendants set aside approximately [REDACTED] a year for Sakhrani, [REDACTED] a year for Robert A. Mineo, [REDACTED] a year for Charles Tomasino, and [REDACTED] a year for Jerome Cuomo.

to design around the patent, and the owner's propensity to defend against attack. (Valuation Report at 23–33.)

{24} The Valuation Report embraced a number of methodologies. To establish fair value, P&A used the income approach. Specifically, it employed the discounted future economic income method. This approach enjoys "wide use and acceptance" in IP valuations. (Valuation Report at 23.) To capture "complex model interactions in the face of uncertain estimating assumptions," P&A prepared value calculations using Latin Hypercube simulation algorithms. (Valuation Report at 34.) These algorithms allowed P&A to generate meaningful estimates despite the complexity and uncertainty of TriboFilm's situation. P&A also used a Fisher-Pry model to project a market adoption rate for TriboFilm technologies (Valuation Report at 35) and Monte Carlo simulation methods to consider the uncertainty in TriboFilm's underlying earnings potential.

{25} The Court has considered the parties' criticisms (*see infra* section III.C) and finds no fault with P&A's methodologies. Its approach was appropriate for this type of business and clearly in the mainstream of IP valuation methodologies.

B.

ASSIGNMENT

{26} After performing 10,000 simulations "on the income valuation model using a Latin Hypercube sampling algorithm," P&A assigned the fair value of TriboFilm's IP portfolio at [REDACTED]. (Valuation Report at 75.) Its valuation model indicated, at a 90% confidence level, that TriboFilm's fair value ranged between [REDACTED] and [REDACTED], with a mean value of [REDACTED] and a median value of [REDACTED]." (Valuation Report at 75.) P&A then selected the statistical median, [REDACTED], as the expected value. Selecting the median allowed P&A to remove "the impact of improbable outliers." (Valuation Report at 75.)

{27} When rendering its fair value opinion, P&A identified certain factors as "important and unique" to its assignment: value proposition, reachable market, market adoption, competitive market, and the timing, useful life, and estimation of

any revenues. (Valuation Report at 43–56.) P&A conveyed a high level of confidence in its assignment:

> It is our opinion, based upon a reasonable degree of probability within the valuation industry, that the income approach provides a credible indication for this assignment for the following reasons:
>
> - We had reasonable data and definitions for all revenues, operating costs, and capital needs.
>
> - The technology is ready for sale.
>
> - We simulated the business model 10,000 times to account for the uncertainty of certain valuation assumptions that we made in the valuation model.
>
> - We tested the simulation results to ensure that we did not have conditions of multicollinearity, which could distort the statistical results that we generated.

(Valuation Report at 76.)

{28} The Court also places confidence in the Valuation Report and accepts P&A's assignment as a reliable indicator of fair value under section 55-14-31(d). However, in light of post-valuation changes at TriboFilm, the Court will revisit P&A's value assignment in section V.

C.

CRITICISMS

{29} Pellegrino prepared a thorough valuation of TriboFilm, after which the parties provided feedback. Not surprisingly, both sides held, and continue to hold, widely divergent views as to Pellegrino's methods, assumptions, and conclusions.

{30} Defendants contend that Pellegrino *overstated* the value of the TriboFilm technologies. They criticize, among other things, his use of hypothetical information and extraordinary assumptions. In addition, they believe his estimates on future royalty income and market share are inaccurate and think it was inappropriate to include additional value on account of the StaClear technology. They put forward a dim outlook, emphasizing a number of worst-case scenarios.

{31} Plaintiffs, on the other hand, maintain that Pellegrino *understated* the value of TriboFilm. They criticize his use of a discount rate and his rejection of the

market approach. They believe his narrow focus on the pre-filled syringe market is misguided and see great promise in the contrast media syringe market.

{32} Pellegrino addressed each of these criticisms in a memorandum to the Court and then again at trial. He provided clear and understandable responses that satisfied any concerns the Court may have had. Any shortcomings that may develop can be attributed to the intrinsic uncertainty of early-stage IP valuation (*see* ¶ 23) and the adversarial climate of this valuation in particular.[9]

IV.

UNCERTAINTIES

{33} Patents are unique by definition. Determining the value of any patented technology at an early stage inevitably leads to a great amount of uncertainty. Such value may range from zero to tens of millions of dollars, depending on future events. This case is no exception. The Court recognizes that its determination involves a number of unknowns concerning market conditions, trends, and the physical, legal, and economic characteristics of the TriboGlide and StaClear technologies, including:

- The level of interest the technologies will garner and whether the timing of such interest will be immediate or delayed;

- The amount of time it will take for a pharmaceutical company to perform stability testing and whether the company will decide to introduce the product after six months or two years of testing;

- The per-syringe royalties, which will vary depending on the value of the specific drug;

- The best way to commercialize the technology, whether that be through the pharmaceutical companies or equipment suppliers;

- IVEK's continued interest in the TriboGlide technology;

- The value, if any, in the contrast media syringe market and the hypodermic disposable syringe market;

- The application of the TriboGlide technology to other materials, like razor blades, catheters, and medical implants;

---

[9] In a July 2009 email to counsel, Pellegrino expressed frustration with Defendants' behavior: "Defendants actions to obscure important details are making my job more difficult, it is taking longer, and it is costing all Parties more." (Pls.' Trial Ex. 1.) If Defendants have problems with the P&A valuation, those problems stem, in part, from their adversarial approach to the valuation process.

- The possibility of packaging TriboFilm's IP portfolio for sale as opposed to licensing the technologies;

- The patent protection against competitors in foreign countries;

- The development of new insulin pump technologies and whether such technologies will render the TriboGlide technology obsolete; and

- The reliability of P&A's modeling techniques.

{34} In the face of so many uncertainties, the Court declines to bind the parties to any fixed dollar amount. TriboFilm may bunt a single or hit a grand slam or fall anywhere in between. It would be inequitable under the circumstances of this case to limit "fair value" to an inflexible purchase price. Therefore, the Court will exercise its discretion under section 55-14-31(d) and determine that fair value in this case is best realized through an assignment that includes a royalty sharing arrangement. Details of this dual assignment will be discussed more fully in section V.B below.

V.

FAIR VALUE

{35} The inherent difficulty in valuing IP where the future is uncertain is no simple task. Moreover, any valuation methodology that involves ongoing financial involvement must minimize future disputes and litigation. The Court will reach a determination of fair value by balancing P&A's assignment with other factors, including material changes in condition and practical and equitable considerations.

A.

MATERIAL CHANGES

{36} Pellegrino performed his valuation in a professional manner; however, two material changes occurred after he issued his report. First, TriboFilm halted all StaClear development and will no longer be pursuing a market for the technology. Therefore, StaClear would only add minimal value, if any, to TriboFilm's portfolio.[10] Moreover, any potential value is further hindered by the death of Dr. Chiklis, a key

---

[10] This new "minimal value" projection is not far apart from P&A's original projection. According to the Valuation Report, the "key factors that drive TriboFilm value all relate to TriboGlide." (Valuation Report at 76.) Therefore, P&A already had concluded that StaClear would bring "minimal value" to TriboFilm's IP portfolio. (Valuation Report at 76.)

player in the StaClear development. The Court considered this shelving of the StaClear technology when reaching its decision on fair value.

{37} Second, TriboFilm has landed two license agreements since P&A issued its Valuation Report. In November 2009, TriboFilm executed a license agreement with [REDACTED], and then on January 29, 2010, TriboFilm executed a second license agreement with [REDACTED].[11] The royalty numbers in the [REDACTED] agreement were much lower than P&A's estimates, but this licensing deal proves that license opportunities exist for TriboFilm. Plus, lower royalties could lead to higher volume. Nonetheless, the Court has considered how these new developments will impact P&A's fair value assignment.

B.

THE COURT'S ASSESSMENT

{38} There is no doubt that Pellegrino prepared his valuation in a professional manner or that his modeling techniques fit with accepted norms. He did what he was asked to do objectively and free from any bias. The Court concludes that his ultimate assignment was not unreasonable under the circumstances of this case. He was correct to focus on the pre-filled syringe market; he was correct to assign StaClear minimal value; and he was correct to try to place some value on the future, especially in light of the two new license agreements identified above.

{39} However, a number of significant changes have occurred since Pellegrino prepared his Report. Therefore, it would be inequitable to bind the parties to his [REDACTED] fair value assignment. Instead, the Court will determine fair value in a manner that will provide greater flexibility and a more equitable end result.

{40} Of paramount concern to the Court is the high level of uncertainty and the current number of unknowns. If the TriboGlide technology proves successful, it will be a major improvement for medical care. Such success, though, is far from certain. Setting a purchase price at this juncture could create a windfall for either party. In contrast, a fair value assignment that includes a royalty sharing arrangement would offer the parties an equitable and workable resolution.

---

[11] TriboFilm executed the [REDACTED] agreement four days prior to the valuation hearing.

{41}   Therefore, the Court finds as a fact and concludes as a matter of law that the fair value of Plaintiffs' collective shares is [REDACTED], plus a [REDACTED] royalty sharing arrangement.[12]  The [REDACTED] assignment represents 40% of Pellegrino's low value.[13]  *See supra* ¶ 26.  Using Pellegrino's low value counterbalances the changes that have occurred since he prepared his Valuation Report.[14]

{42}   The second part of the assignment awards Plaintiffs [REDACTED] of all future royalties, license fees, payments from IVEK, and proceeds from the sale or liquidation of all TriboGlide and StaClear patents and technologies, exclusive of any reasonable technical support fees and amounts owed to IVEK.  This royalty sharing arrangement injects flexibility into the Court's assignment, minimizing the future impact of the uncertainties identified above in section IV.  Moreover, it provides Defendants with an incentive to maximize their fees and royalty agreements and Plaintiffs with an incentive to support the TriboFilm technologies.  In order to minimize the potential litigation between the parties, the Court elected a royalty on receipts rather than an income approach.

{43}   If an appellate court were to determine this fair value/royalty sharing arrangement inappropriate, then the Court would assign Vernon and Williams's total interest in TriboFilm a value of [REDACTED].  The [REDACTED] assignment represents 40% of [REDACTED].[15]  Under this alternative assignment, it would be unnecessary to apply a discount for lack of control or marketability based on the circumstances of this case.  *See Royals v. Piedmont Elec. Repair Co.*, 1999 NCBC 1 ¶ 57 (N.C. Super. Ct. Mar. 3, 1999), http://www.ncbusinesscourt.net/opinions/1999%20NCBC%201.htm, *aff'd*, 137 N.C. App. 700, 529 S.E.2d 515 (Ct. App. 2000), *disc. rev. denied*, 352 N.C. 357, 544 S.E.2d 548 (2000).

---

[12] The Court will require TriboFilm to pay 50% of the [REDACTED] at closing.  Requiring a 50% down payment is fair based on the fact that TriboFilm's license agreement with [REDACTED] included an initial fee payment of [REDACTED] to TriboFilm.

[13] Plaintiffs collectively own a 40% interest in TriboFilm.

[14] The Court acknowledges that TriboFilm has received a cash injection from the two license agreements.  While the Court does not believe that payment of the entire amount received as back salaries is equitable, some back salary is due, and the Company must have money to continue to market the technology.

[15] To calculate an assignment value stripped of any royalty sharing arrangement, the Court reduced P&A's fair value assignment of [REDACTED] (which included future royalties) to [REDACTED].

CONCLUSION

{44}   Based on the foregoing, it is hereby ORDERED, ADJUDGED, and DECREED:

1.   The purchase price for Vernon and Williams's total interest is set at [REDACTED] cash and note, plus a [REDACTED] royalty.

2.   Closing shall take place within twenty (20) business days of this Order.  The cash portion of the purchase price shall be paid 50% at closing and the remaining balance in two equal annual installments bearing no interest.  TriboFilm will execute a note for the remaining balance which shall be secured by a security interest in the TriboGlide and StaClear intellectual property.

3.   In addition, Plaintiffs shall receive [REDACTED] of all future royalties, license fees, payments from IVEK, and proceeds from the sale or liquidation of all TriboGlide and StaClear patents and technologies, exclusive of any reasonable technical support fees and amounts owed to IVEK.  The royalty will apply to all transactions entered into after February 2, 2010.

4.   If an appellate court were to find the arrangement set forth in numbers 1 through 3 above inappropriate, this Court would set the purchase price for Vernon and Williams's total interest at [REDACTED], with 50% payable at closing and the remaining balance in two equal annual installments bearing no interest with the indebtedness secured by a security interest in the TriboGlide and StaClear intellectual property.

IT IS SO ORDERED, this 15th day of March, 2010.