High Point Bank & Trust Co. v. Sapona Mfg. Co., 2010 NCBC 11.

STATE OF NORTH CAROLINA

RANDOLPH COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
08 CVS 1065

HIGH POINT BANK AND TRUST
COMPANY, as Executor of the
Estate of Elizabeth M. Simmons,

Plaintiff,

v.

SAPONA MANUFACTURING COMPANY,
INC., ACME-McCRARY CORPORATION,
RANDOLPH OIL COMPANY, C.W.
McCRARY, JR., C. WALKER McCRARY,
III, W.H. REDDING, JR. a/k/a WILLIAM
H. REDDING, JR., S. STEELE REDDING,
JOHN O.H. TOLEDANO, JOHN O.H.
TOLEDANO, JR., ROBERT C.
SHAFFNER, BRUCE T. PATRAM,
JOHNNY R. KNOWLES a/k/a JOHNNY
R. KNOWLES, SR., DEAN F. LAIL,
VIRGINIA R. WEILER, JAMES W.
BROWN, JR., DONNIE R. WHITE a/k/a
DONALD R. WHITE, DIANE L.
DONAHUE, LARRY K. SMALL, LARRY
D. ELMORE, and M. GIL FRYE a/k/a
MICHAEL G. FRYE,

Defendants.

ORDER & OPINION

{1}     These cross-motions for summary judgment require the Court to decide, as a matter of law, whether the plaintiff minority shareholder has a right or interest in the Defendant Corporations and, if so, whether those rights or interests are in need of protection. *See generally Meiselman v. Meiselman*, 309 N.C. 279, 307 S.E.2d 551 (1983).  The "right or interest" claimed by Plaintiff is the right to tender the shares owned by decedent, Elizabeth M. Simmons, for redemption at fair value by each of the Defendant Corporations.  The Court concludes that Plaintiff has not established a *Meiselman* right and grants summary judgment in favor of Defendants.

*Roberson Haworth & Reese, PLLC by Robert A. Brinson, Thomas F. Foster, and Christopher C. Finan for Plaintiff.*

*Ellis & Winters, LLP by J. Donald Cowan, Jr. and Schell Bray Aycock Abel & Livingston PLLC by Doris R. Bray for Defendants.*

Tennille, Judge.

## I.
## PROCEDURAL BACKGROUND

{2}     Plaintiff High Point Bank and Trust Company ("Plaintiff" or the "Bank"), as Executor of the Estate of Elizabeth M. Simmons ("Mrs. Simmons"), filed a Notice of Designation contemporaneously with the Complaint in Randolph County on April 18, 2008.  This matter was designated a mandatory complex business case by Order of the Chief Justice of the North Carolina Supreme Court dated April 28, 2008, and was subsequently assigned to the undersigned Chief Special Superior Court Judge for Complex Business Cases.

{3}     On October 20, 2009, the parties filed cross-motions for summary judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure.  Plaintiff and Defendants each filed a memorandum of law in opposition to the other side's motion on November 20, 2009, and the Court heard oral arguments on February 8, 2010.

## II.
## THE PARTIES

{4}     Plaintiff is the duly appointed and qualified Executor of the Estate of Mrs. Simmons and is currently administering Mrs. Simmons's estate.

{5}     Defendant Sapona Manufacturing Company, Inc. ("Sapona") is a corporation duly organized and existing under the laws of the State of North Carolina, with its principal place of business in Randolph County, North Carolina.

{6}     Defendant Acme-McCrary Corporation ("Acme-McCrary") is a corporation duly organized and existing under the laws of the State of North Carolina, with its principal place of business in Randolph County, North Carolina.

{7}     Defendant Randolph Oil Company ("Randolph Oil") is a corporation duly organized and existing under the laws of the State of North Carolina, with its principal place of business in Randolph County, North Carolina.

{8}     Defendants C.W. McCrary, Jr., C. Walker McCrary, III, W.H. Redding, Jr., S. Steele Redding, John O.H. Toledano, John O.H. Toledano, Jr., Robert C. Shaffner, Bruce T. Patram, Johnny R. Knowles, Dean F. Lail, Virginia R. Weiler, and James W. Brown, Jr. served on the Board of Directors at Sapona.

{9}     Defendants C.W. McCrary, Jr., C. Walker McCrary, III, W.H. Redding, Jr., S. Steele Redding, John O.H. Toledano, John O.H. Toledano, Jr., Bruce T. Patram, Virginia R. Weiler, Donnie R. White, Diane L. Donahue, and Larry K. Small served on the Board of Directors at Acme-McCrary. (*See* Pl.'s Ex. 11.)

{10}    Defendants C.W. McCrary, Jr., C. Walker McCrary, III, John O.H. Toledano, John O.H. Toledano, Jr., Robert C. Shaffner, Larry D. Elmore, and M. Gil Frye served on the Board of Directors at Randolph Oil.

{11}    Acme-McCrary, Sapona, and Randolph Oil will be referred to collectively as the "Defendant Corporations," and the parties listed in Paragraphs 8, 9, and 10 will be referred to collectively as the "Defendants."

III.

FACTUAL BACKGROUND

{12}    The pertinent and material facts are undisputed.

{13}    Acme-McCrary has been in existence for over one hundred years. It was formed by D.B. McCrary and T.H. Redding in 1909. (W.H. Redding, Jr. Dep. 13:11–24.) It manufactures ladies hosiery and shape wear products. (W.H. Redding, Jr. Interview 9:3–19.) Sapona is even older. It started in the 1800s. (W.H. Redding, Jr. Dep. 20:3–4.) D.B. McCrary, T.H. Redding, and W.J. Armfield, Jr. purchased Sapona in 1916. Sapona processes natural and synthetic yarn, including textured nylon and covered spandex, and supplies Acme-McCrary and others with yarn product. Sapona and Acme-McCrary have a close business relationship. The

companies share a number of services, including health insurance, accounting, and other personnel services. (S. Redding Dep. 18:5–16.)

{14} Randolph Oil is in a different industry. It sells fuel oil, gasoline, and LP gas at wholesale and retail and has several convenience store locations. (Elmore Dep. 10:22–11:19.) It was founded in 1934 by C.W. McCrary, who was the son of D.B. McCrary. The Redding and Armfield families are not significantly involved in Randolph Oil and the business is currently run by Larry Elmore, who is not related to any of the founding families. (Elmore Dep. 9:8–15.)

{15} Each company has a significant number of employees. Randolph Oil has approximately 49 employees, one of whom is a shareholder. (Randolph Oil Aff. ¶ 2.) Acme-McCrary has approximately 892 employees, five of whom are shareholders. (Acme-McCrary Aff. ¶¶ 2–3.) Sapona has approximately 200 employees, two of whom are shareholders. (Sapona Aff. ¶¶ 2–3.)

{16} The stock in each of the companies has been passed down through at least two generations and perhaps more. Mrs. Simmons is the granddaughter of D.B. McCrary, one of the founders of Acme-McCrary and Sapona, and the daughter of C.W. McCrary, Sr., the founder of Randolph-Oil. (C. Simmons Aff. ¶ 9; Answer ¶ 10.) She inherited her shares in the Defendant Corporations from her parents. (C. Simmons Aff. ¶ 9.) She is survived by her husband, Charles Simmons, and their four children. (C. Simmons Aff. ¶ 6.) All are beneficiaries of the trust. (C. Simmons Aff. ¶ 6.)

{17} There is evidence that Mrs. Simmons had been providing support for her son, Bo, and placed the shares in trust to continue that support. (Allen Dep. 71:14–72:7.) Such an action is not inconsistent with a belief that the dividends paid by the Defendant Corporations would provide that support. There also is evidence from the Bank's trust officer that when she raised the possibility that some of the stock in Defendant Corporations might have to be sold, Mrs. Simmons responded that there wouldn't be a problem without giving any explanation for why she did not think there would be a problem. (Allen Dep. 72:8–15.)

{18}    Over time, the ownership in each of the companies has been spread over a larger number of shareholders as the founding owners and successive generations have died and passed their ownership to their children.  Acme-McCrary now has eighty-one shareholders, while Sapona has fifty-one and Randolph Oil has twenty-five.  (Acme-McCrary Aff. ¶ 2; Sapona Aff. ¶ 2; Randolph Oil Aff. ¶ 2.)  Non-family members have become shareholders and approximately seventy-five percent of the shareholders in Acme-McCrary and Sapona overlap.  (S. Redding Dep. 18:5–11.)

{19}    As a result of the increase in the shareholder base, each company has adopted corporate governance practices normally associated with a corporation.  Regular shareholder meetings are conducted; shareholders are provided with financial information; proxies are solicited; and dividends are paid.  (Acme-McCrary Aff. ¶¶ 5, 7; Sapona Aff. ¶¶ 5, 7; Randolph Oil Aff. ¶¶ 4, 6.)  The companies also conduct their businesses in accordance with modern management practices.  (Acme-McCrary Aff. ¶ 6; Sapona Aff. ¶ 6; Randolph Oil Aff. ¶ 5.)

{20}    There is no evidence that there is a market for the minority shares held by the Trust or any other minority shares.  (S. Redding Dep. 29:7–25.)  The shares of all shareholders appear to be locked in absent some action on the part of a majority of shareholders to address that deadlock.

{21}    While there is no significant number of shareholder employees in the companies, family members do participate at the board and officer levels.  Seven of the eleven members of the Board of Acme-McCrary are related to D.B. McCrary and T.H. Redding, as well as four of the nine officers.  (Acme-McCrary Aff. ¶ 4.)  Seven of the twelve directors of Sapona are related to the three original founders, as well as four of the nine officers.  (Sapona Aff. ¶ 4.)  And at Randolph Oil, four of the seven directors are members of the McCrary family, as well as two of the five officers.  (Randolph Oil Aff. ¶ 3.)  In addition, there is substantial, but not complete, overlap in the boards of Acme-McCrary and Sapona.  (Answer ¶¶ 5–6.)

{22}    All the Defendant Corporations have a history of paying dividends.  (*See* Sapona Aff. ¶ 7; Acme-McCrary Aff. ¶ 7; Randolph Oil Aff. ¶ 6.)  Attached to this Order and Opinion is a history of the recent dividends paid either to Mrs. Simmons

or the Bank as Trustee.  *See* tbl.2.  Equivalent per-share dividends were paid to all other shareholders.  There is no evidence in this record that those dividends were determined in any way with reference to Mrs. Simmons's or the Bank's financial situation.  Every indication is that the boards of directors of the Defendant Corporations exercised their business judgment in setting the dividend rate in light of company earnings and business conditions.

{23}  In only one instance have Acme-McCrary and Sapona purchased shares from the estate of a deceased shareholder.  In 1997 Tommy Redding, brother of Steele Redding, died at age forty leaving behind a family with small children.  (W.H. Redding, Jr. Dep. 62:19, 63:13–15.)  He was an employee, officer, and director of Acme-McCrary.  (W.H. Redding, Jr. Dep. 63:4–12.)  His shares were held by Wachovia Bank as Trustee under his will.  Both companies, after considering their financial condition and business prospects, offered to purchase all of the Trustee's shares in the corporations.  (Defs.' Interrog. Answers at 5–6.)

{24}  Following that purchase, the two companies made a tender offer to all shareholders to give them the opportunity to sell some of their shares back to the companies.  The tender offer letters were virtually identical except for price.  Acme-McCrary offered $51.00 a share for five thousand shares and Sapona offered $55.00 a share for five thousand shares.  (Defs.' Br. Supp. Mot. Summ. J. Ex. A, B.)  Each letter read in part:

> Your Company is pleased to give you the opportunity to sell some or all of your shares of _____common stock if you desire to do so.  Because there is no market for the Company's stock, the Company's Board of Directors believes it appropriate that shareholders be given the opportunity to liquidate their investment from time to time.  Therefore, the Company is offering to purchase up to 5,000 shares of its common stock for the price of _____ per share.
>
> . . . .
>
> The offer to purchase stock is being made as an accommodation to shareholders who may wish to liquidate some or all of their investment in the Company.

(Defs.' Br. Supp. Mot. Summ. J. Ex. A, B.)

{25}   In January 2000, Sapona made a second tender offer to all shareholders, offering to buy ten thousand shares at a price of $60.00 a share. (Defs.' Br. Supp. Mot. Summ. J. Ex. C.) The wording of the 2000 letter was virtually identical to the wording of its 1997 letter. Mrs. Simmons did not tender any shares in response to those three offers, nor did she communicate an understanding that all her shares would be repurchased on her death. (*See* Allen Dep. 33:23–34:7.)

{26}   It is undisputed that the directors of both Acme-McCrary and Sapona recognized the problem of marketability that resulted from the wide diversity of shareholders who did not participate in the day-to-day operations. As far as this record discloses, there has never been any agreement among shareholders or by-law or charter provision requiring any of the Defendant Corporations to repurchase the shares of any shareholder. It also is clear that Acme-McCrary's and Sapona's directors still have a policy of buying back shares on a prorated basis from all shareholders from time to time when the directors believe the funds are available to do so without harming the financial condition of the company.

{27}   Randolph Oil has never made a tender offer to its shareholders and has never purchased a deceased shareholder's stock for its own account. It has acted as a conduit for transfer of shares among shareholders. (*See* Elmore Dep. 13:19–14:24.) It has never had a policy of making tender offers for shares.

{28}   Following Mrs. Simmons's death, the Bank wrote to all the Defendant companies requesting that Mrs. Simmons's shares be redeemed at fair market value. (Defs.' Br. Supp. Mot. Summ. J. Ex. D, E, F.) The Bank had George B. Hawkins of Banister Financial, Inc. prepare an independent appraisal of the fair value of shares that Mrs. Simmons's estate held in each company.

Table 1:  Fair Value and Total Value of Mrs. Simmons's Shares

| Company | Number of Shares | Value Per Share | Total Value |
|---|---|---|---|
| Acme-McCrary | 14,449 | $23.97 | $346,343 |
| Sapona | 20,950 | $149.37 | $3,129,302 |
| Randolph Oil | 815 | $137.90 | $112,389 |

(Acme-McCrary Report at 4; Sapona Report at 4; Randolph Oil Report at 4.)

{29} The boards of each of the Defendant Corporations have met to consider the Bank's demands and have rejected them. In the case of each company, individual shareholders have made offers to purchase shares from the Bank at prices which were well below the values determined by Mr. Hawkins. The Bank characterizes those offers as coercive and oppressive in light of the refusal of the directors to repurchase the shares. The Bank also points to some personality conflicts between the Simmonses and the Toledanos arising from disputes over other property the families owned together as evidence of oppression and bad faith.

## IV.
## SUMMARY JUDGMENT

{30} Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C. R. Civ. P. 56(c). "An issue is 'genuine' if it can be proven by substantial evidence and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a defense." *Lowe v. Bradford*, 305 N.C. 366, 369, 289 S.E.2d 363, 366 (1982) (citation omitted). "It is not the purpose of the rule to resolve disputed material issues of fact but rather to determine if such issues exist." N.C. R. Civ. P. 56 cmt.

{31} The burden of showing a lack of triable issues of fact falls upon the moving party. *See, e.g., Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985). Once this burden has been met, the nonmoving party must "produce a forecast of evidence demonstrating that [it] will be able to make out at least a prima facie case at trial." *Collingwood v. Gen. Elec. Real Estate Equities, Inc.*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989). Courts must exercise caution in granting a motion for summary judgment. *N.C. Nat'l Bank v. Gillespie*, 291 N.C. 303, 310, 230 S.E.2d 375, 379 (1976).

V.

STATUTORY AUTHORITY

A.

SECTION 55-14-30(2)

{32}   Section 55-14-30(2) of the North Carolina General Statutes provides that a "superior court may dissolve a corporation . . . [i]n a proceeding by a shareholder if it is established that . . . liquidation is *reasonably necessary* for the protection of the *rights or interests* of the complaining shareholder." N.C. Gen. Stat. § 55-14-30(2)(ii) (2009) (emphasis added). Relief is not available for an individual shareholder who simply *needs* the corporation to take some action for his or her own benefit.[1] There must be a shareholder right or interest that is being contravened.

{33}   If such a set of circumstances exist, the decision to dissolve the corporation is within the court's discretion. *See Royals v. Piedmont Elec. Repair Co.*, 137 N.C. App. 700, 704, 529 S.E.2d 515, 518 (2000) (citation omitted). When a court decides that dissolution is appropriate, the defendant corporation is left with two options: (1) face dissolution or (2) buy out the complaining minority shareholder's shares at fair value.[2] The buy-out alternative to dissolution, however, is only available to the

---

[1] There is no question of the Trustee's need in this set of circumstances. It has an estate and trust whose only assets consist of stocks in closely held businesses. If those businesses do not provide income to the trust, the Trustee cannot fulfill its duties to the beneficiaries under the trust arrangement. This need, as realistic as it is, should be distinguished from a right or interest. Although the need may justify the "reasonably necessary" prong of the statutory requirement, it does not create a "right or interest" under statute or case law. The Trustee in this case is simply trying to fulfill its obligations to the beneficiaries of the trust. It was dealt a poor hand to do so. (*See* Allen Dep. 59:20–60:1.)

[2] This Court has consistently held that it has the inherent power and statutory authority to structure the terms under which the minority shareholder's shares are purchased, and that power has been affirmed on appeal. *See Royals v. Piedmont Elec. Repair Co.*, 1999 NCBC 1 ¶ 61 (N.C. Super. Ct. Mar. 3, 1999), http://www.ncbusinesscourt.net/opinions/1999%20NCBC%201.htm, *aff'd*, 137 N.C. App. 700, 529 S.E.2d 515 (2000); *Vernon v. Cuomo*, 2010 NCBC 5 ¶ 12 (N.C. Super. Ct. Mar. 15, 2010), http://www.ncbusinesscourt.net/opinions/2010_NCBC_5.pdf. However, this Court does not have the power to craft other flexible relief.

defendant corporation.[3]  Trial courts are not at liberty to order a buyout under the current statute.[4]

{34}   The Court will consider whether Plaintiff is entitled to judicial dissolution under section 55-14-30(2)(ii) in part VI below.  However, before doing so, the Court will digress briefly to address the former version of the statute.

B.

SECTION 55-125.1

{35}   A significant difference exists between the statutory framework in which North Carolina courts analyzed *Meiselman* and the framework in existence today. Section 55-14-30(2)(ii) of the North Carolina General Statutes was brought forward from section 55-125(a)(4), which is discussed extensively in *Meiselman*.  Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 28.11 & n.2 (7th ed. 2009).  Former section 55-125.1 gave the trial court the power to order alternative forms of relief.  Specifically, it provided the following:

> In any action filed by a shareholder to dissolve the corporation under G.S. 55-125(a), the Court may make such order or grant such relief, other than dissolution, as in its discretion it deems appropriate, including, without limitation, an order . . . [p]roviding for the purchase at their fair value of shares of any shareholder, either by the corporation or by other shareholders, such fair value to be determined in accordance with such procedures as the court may provide.

N.C. Gen. Stat. § 125(a)(4) (1986) (former version of N.C. Gen. Stat. § 55-14-30(2)(ii)). In addition to the buyout at fair value option, the former statute also gave superior courts other alternatives to dissolution, like altering corporate bylaw provisions and prohibiting certain corporate actions.[5]  After *Meiselman*, the Legislature eliminated

---

[3] The perverse result of this limitation in this case is that the court cannot order the shares tendered to be purchased.  It can only order dissolution.  Although it is highly unlikely that the Defendant Corporations would not exercise their option to purchase, the possibility of dissolution does exist.
[4] In this case, dissolution would deprive Plaintiff of the real benefit it seeks because dissolution probably would not produce a fair market value for Mrs. Simmons's shares.  This dilemma suggests a potential need for statutory amendment to provide more flexibility in remedies.  In *Meiselman*, our Supreme Court charged trial courts with the task of prescribing "the form of relief which the evidence indicates is most appropriate, should it find that relief is warranted."  *Id.* at 306, 307 S.E.2d at 567. That flexibility was provided by section 55-125.1, which is no longer in effect.  *See infra* Part V.B.
[5] Former section 55-125.1 gave the court the power to order or grant alternative remedies to dissolution, including, without limitation, an order:

the alternative remedies to dissolution set forth in section 55-125.1. Courts do not enjoy such broad powers under the current statute. Robinson, II, *supra*, § 28.12[2].

## VI.
## DISCUSSION
### A.
### *MEISELMAN*

{36} Because Plaintiff asserts a right or interest in the Defendant Corporations under *Meiselman*, the Court begins with a review of that decision.

{37} In *Meiselman*, the Supreme Court of North Carolina remanded the case to the trial court for a determination of the rights and interests of a plaintiff minority shareholder. *Meiselman v. Meiselman*, 309 N.C. 279, 305–06, 307 S.E.2d 551, 566–67 (1983). The Supreme Court held that the trial court erred in using standards of oppression, overreaching, gross abuse, unfair advantage, and the like with respect to the majority shareholder's actions rather than focusing on the "rights or interests" that the minority shareholder had in the defendant corporations and whether those rights or interests needed protection. *Id.* That focus is significant in this case.

{38} Plaintiff asserts a right to tender the shares Mrs. Simmons owned in each of the Defendant Corporations. If such a right exists, it needs protection because the Defendant Corporations have refused to purchase the shares that Mrs. Simmons owned. Thus, the central question is whether a buyout at fair value is an enforceable right or interest under *Meiselman*. In the subparts below, the Court will consider this question and determine whether the record before it warrants summary judgment.

---

(1) [c]anceling or altering any provision contained in the charter or bylaws of the corporation; or (2) [c]anceling, altering, or enjoining any resolution or other act of the corporation; or (3) [d]irecting or prohibiting any act of the corporation or of shareholders, directors, officers or other persons party to the action; or (4) [p]roviding for the purchase at their fair value of shares of any shareholder, either by the corporation or by other shareholders, such fair value to be determined in accordance with such procedures as the court may provide.

N.C. Gen. Stat. § 125.1(a) (1986) (former version of N.C. Gen. Stat. § 55-14-30(2)(ii)).

1.

GENERAL PRINCIPLES

{39}   The statutory right to judicial dissolution and the underlying rationale of *Meiselman* are counter to the judiciary's traditional deference to majority rule in corporate management and to the business judgment rule. *See Meiselman*, 309 N.C. at 291–92, 307 S.E.2d at 559 ("Unfortunately, when dissension develops in such a situation . . . 'American courts traditionally have been reluctant to interfere in the internal affairs of corporations.'") (citation omitted). Justifying liquidation as a tool for enforcing the rights or interests of a complaining shareholder, therefore, requires a strong showing.

{40}   Deference to majority rule and the business judgment rule may give way under circumstances where such deference would (1) result in a loss of ownership benefits by the complaining shareholder or (2) impose ongoing antagonistic relationships on the defendant corporation in circumstances that require close cooperation and a high degree of good faith and mutual respect. *See id.* at 293, 307 S.E.2d at 559–60. Those two concerns are prominent in *Meiselman* and the cases that follow it.

{41}   For example, on numerous occasions the court in *Meiselman* highlighted the "vulnerable position a minority shareholder occupies in a close corporation" in terms of the benefits of proprietorship. *See, e.g., id.* at 292, 307 S.E.2d at 559 ("Only in the close corporation does the power to manage carry with it the de facto power to allocate the benefits of ownership arbitrarily among the shareholders and to discriminate against a minority whose investment is imprisoned in the enterprise."). It recognized that owners in a business that was run like a partnership expected to receive the normal benefits associated with ownership (often defined by prior involvements) and to participate in management. The court also emphasized the need to avoid mandating adversarial relationships in closely held corporations where the success of the business depends on the good faith, mutual respect, and close cooperation of the participants. *See id.* at 289–90, 307 S.E.2d at 558–59.

{42} None of the underlying factors which drove the decision in *Meiselman* are clearly found in this case. First, there has been no loss of ownership benefits similar to the benefits lost in other *Meiselman* cases.[6] No one is being denied the opportunity to work or compensation and fringe benefits. *See id.* at 302, 307 S.E.2d at 565. The Trust continues to receive the benefits that all other shareholders are receiving and that Mrs. Simmons received prior to her death. (*See* Sapona Aff. ¶ 7; Acme-McCrary Aff. ¶ 7; Randolph Oil Aff. ¶ 6.) There are no claims of dissipation or diversion of assets; and there are no claims of excessive salaries. Furthermore, nothing in the record indicates that any of the Defendant Corporations accumulated capital beyond the reasonable needs of their businesses. *See* I.R.C. §§ 531–37.

{43} Plaintiff has not moved to have larger dividends paid nor has it asserted that the directors have violated their fiduciary duty in determining the level of dividends to be paid. The Defendant Corporations have paid regular dividends when their boards have determined it is financially in their best interest to do so. This regular payment of dividends evidences the directors' intent to free profits for distribution rather than holding them captive or paying out excessive salaries. There is no evidence that any of the directors are using the dividend policy as a means of coercion or oppression against the Bank. Such action would significantly and adversely impact all the other shareholders.[7]

{44} The Defendant Corporation's payment of dividends raises an interesting point with respect to the definition of a close corporation. *Meiselman* contains no determination of the maximum number of shareholders or other characteristics of a close corporation in North Carolina. Our corporate governance statutes provide that under certain circumstances minority shareholders may sue to compel the payment of dividends. *See* N.C. Gen. Stat. § 55-6-40(i). Significantly, the statute

---

[6] Traditional shareholder rights which are already protected by statute include notice of shareholders' meetings, cumulative voting, access to corporate books and records, and the right to compel dividends. The Bank does not seek to enforce any of those rights at this time, nor does it seek to enforce a previously existing right to participate in management. Mrs. Simmons never worked for any of the Defendant Corporations and never participated in their management.

[7] The large number of shareholders distinguishes this case from the typical *Meiselman* situation with a small number of shareholders and a majority shareholder/manager who can withhold dividends and benefits to coerce or oppress the minority. *But see infra* ¶ 50.

only applies to corporations having fewer than twenty-five shareholders. *See id.* That statutory restriction is some indication that corporations with greater than twenty-five shareholders are different from those with fewer shareholders. On the other hand, it is clear that our Supreme Court believes the courts have the power to compel payment of dividends on an equitable basis without regard to the number of shareholders. *See* Robinson, II, *supra*, § 22.05[7]; *Gaines v. Long Mfg. Co.*, 234 N.C. 331, 67 S.E.2d 355 (1951).

{45} *Gaines* stands for the proposition that the courts may intervene only if directors are acting in bad faith and in an arbitrary or oppressive disregard of a minority shareholder's right. The standard for dividends in *Gaines* thus appears to be different from the *Meiselman* standard. The former uses bad faith and oppression, the latter rights and interests. Thus, under *Gaines*, the Bank could seek to compel dividends if they were being wrongfully withheld even though the Defendant Corporations may have more than twenty-five shareholders.

{46} Overall, the Defendant Corporations appear to be well-run in spite of current economic challenges. The only benefit of ownership Plaintiff claims to have lost is an alleged right of redemption. However, Plaintiff's asserted right to have Mrs. Simmons's stock purchased at fair value on her death is not one of the rights or interests which have been recognized by our courts as mandatory in the close corporation setting. To create an absolute right of redemption of a minority interest would place the other shareholders in close corporations at financial risk upon the death of any shareholder.

{47} Second, there are no ongoing intracorporate problems creating the type of antagonistic relationships which troubled the court in *Meiselman*. Mrs. Simmons never worked for any of the Defendant Corporations in any capacity. (Allen Dep. 23:22–24:16.) She never sought employment with any of the corporations, nor was she ever involved in the management. (Allen Dep. 25:15–18, 27:18–28:1.) Although the Trustee attempted to secure a seat on the board of directors of Acme-McCrary and Sapona, it made no other efforts to become involved in day-to-day management.

(Allen Dep. 43:18–44:2.)  In addition, the majority of shares are owned by non-employees whose only connection to the businesses is stock ownership.[8]

{48}   Third, the large number of shareholders and the absence of a controlling majority shareholder also distinguish this case from *Meiselman*.  The Defendant Corporations functioned like corporations, not partnerships.  Although Plaintiff alleges that the majority of outstanding shares and the management have been controlled by persons related by blood or marriage, no evidence suggests that the Defendant Corporations have been operated like family partnerships.  (Allen Dep. 67:10–25; Compl. ¶¶ 26, 66, 96.)

{49}   There is no majority shareholder who owns a controlling block of stock and the majority of shareholders do not work for their respective corporations.  Only five of Acme-McCrary's eighty-one shareholders are employed by Acme-McCrary; only two of Sapona's fifty-one shareholders are employed by Sapona; and only one of Randolph Oil's twenty-five shareholders is employed by Randolph Oil.  (Acme-McCrary Aff. ¶ 2; Sapona Aff. ¶ 2; Randolph Oil Aff. ¶ 2.)  Each of the Defendant Corporations follow corporate formalities, and the majority of officers are not related to any of the founding members.  (Acme-McCrary Aff. ¶¶ 5–6; Sapona Aff. ¶¶ 5–6; Randolph Oil Aff. ¶¶ 4–5.)  Therefore, there is no need to protect the Defendant Corporations against the kind of problems that would affect a business with two or three shareholders who run the business like a partnership.[9]  The facts here simply do not fit the *Meiselman* mold.

{50}   The *Meiselman* line of cases all involve businesses with a smaller number of shareholders.  *See, e.g.*, *Foster v. Foster Farms, Inc.*, 112 N.C. App. 700, 702, 436 S.E.2d 843, 845 (1993) (two shareholders); *Lowder v. All Star Mills, Inc.*, 75 N.C. App. 233, 235–36, 330 S.E.2d 649, 651–52 (1985) (four shareholders in one business, five shareholders in the other business); *Meiselman*, 309 N.C. at 281–82, 307 S.E.2d

---

[8] These shareholders have taken no action to create an expectation on the part of decedent or to diminish her ownership benefits.

[9] Because the Defendant Corporations in this case are no longer small family owned and operated businesses (*see* W.H. Redding, Jr. Interview 83:18–84:7), there is no concern over acrimonious relationships that would impede the performance of management.

at 553–54 (two shareholders). Nonetheless, it is conceivable that *Meiselman* could apply to a business with more than a handful of shareholders. The Court has considered Defendants' ten shareholders or less argument. (*See* Defs.' Mem. Supp. Mot. Summ. J. at 10.) However, at this time, the Court is not prepared to enter a ruling which would remove *Meiselman* considerations from corporations with some specific number of shareholders. That does not mean that the Court should not consider the number, composition, and rights and interests of the non-complaining shareholders. Those are important considerations, especially given the large number of shareholders in the Defendant Corporations.

{51} There is little doubt that the shareholder base in each of the Defendant Corporations will become more fragmented in the future.[10] However, that does not justify dissolution. The shareholders of these companies will have the same power of the vote. A majority vote will control, as it does now.

{52} Without a clear understanding among a large and varied stockholder base, the Court would be interjecting itself in a decision that generally would be made by a board of directors and subject to the business judgment rule or the vote of the majority of the shareholders. This is not the clear-cut partnership-like business with a small number of shareholders who work in the business and who expect to remain employed. Accordingly, this Court should defer to majority rule and the application of the business judgment rule. As our Supreme Court recognized in *Meiselman*, "[t]he principle of majority rule is in traditional legal thought a firmly established attribute of the corporate form." *Id.* at 292, 307 S.E.2d at 559. Where, as here, there is no impediment to the majority of shareholders exercising their voting rights, the courts should not intervene on behalf of a minority shareholder.

---

[10] The creation of some effective plan for the repurchase of shares or creation of a market for minority shares would be advantageous for the shareholders.

## 2.
## REASONABLE EXPECTATIONS

{53}  Again, the central question before the Court is whether a buyout at fair value is an enforceable right or interest.  The "rights or interests" inquiry under *Meiselman* revolves around the concept of reasonable expectations.[11]

{54}  *Meiselman* has been the leading case for determining what rights or interests are protected under North Carolina's dissolution statute.  It outlines a four-step process for obtaining relief based upon the complaining shareholder's *reasonable expectations* and the circumstances giving rise to those expectations.

> *First*, the complaining shareholder must prove he had one or more substantial reasonable expectations that were known or assumed by the other shareholders.  Examples of such expectations might include ongoing participation in the management of the company or secure employment with the company.  *Second*, he must demonstrate that the expectation or expectations have been frustrated.  *Next*, the complaining shareholder must show that this frustration of expectations was not the product of his own fault and was largely beyond his control.  *Finally*, he must show that the specific circumstances warrant some form of equitable relief.

*Royals v. Piedmont Elec. Repair Co.*, 137 N.C. App. 700, 705, 529 S.E.2d 515, 518 (2000) (citations omitted) (emphasis added).  Because the Court grants summary judgment in Defendants' favor on the first prong of the analysis, it need not address the remaining three prongs of *Meiselman*'s reasonable expectations analysis.[12]

{55}  Plaintiff does not claim an absolute right of redemption.  Rather, its claim to a right of redemption is based upon a reasonable expectation that allegedly developed over an entire history of relationships and dealings.  (*See* Pl.'s Br. Supp. Mot. Summ. J. at 11.)  As the North Carolina Court of Appeals explained in *Royals*:

---

[11] This case presents a different slant on *Meiselman* in that it raises the question of who must know about the expectations.  Plaintiff's evidence of the shareholders' knowledge of her expectations is based upon corporate action rather than the action of a majority shareholder.  Plaintiff seeks to bind the other shareholders based on board action by Sapona and Acme-McCrary to which the other minority shareholders did not object.  In effect, Plaintiff seeks to substitute the corporate defendant for the majority shareholder in *Meiselman*.  This case is distinguishable from *Meiselman* on that ground alone.

[12] The Court will briefly consider certain equities that would typically fall under the fourth prong of the *Meiselman* analysis in part VI.A.3.

*Meiselman* states that a complaining shareholder's reasonable expectations cannot be viewed in a vacuum; rather they must be examined and re-evaluated over the entire course of the various participants' relationships and dealings. Furthermore, these expectations are not limited to those memorialized in the by-laws or other written instruments; "[they] must be gleaned from the parties' *actions* as well as their signed agreements."

*Id.* at 706, 529 S.E.2d at 519 (alteration in original) (citing 2 F. Hodge O'Neal & Robert B. Thompson, *O'Neal's Close Corporations* § 9.30 (3d ed. 1998)).

{56} Plaintiff relies on an argument that each of the Defendant Corporations and their shareholders *should have known of Mrs. Simmons's expectations* based upon one prior repurchase from a shareholder's estate and three redemption letters that two of the Defendant Corporations previously mailed to shareholders. (*See* Pl.'s Br. Supp. Mot. Summ. J. at 13.) The Court rejects this argument.

{57} The right of redemption is a right generally spelled out in an agreement that specifically sets out when the right is triggered, what the purchase price will be, and how the purchase price will be paid.[13] In this case, Plaintiff is unable to point to a specific agreement.[14] Instead, it directs the Court's attention to certain prior acts of the Defendant Corporations: (1) Acme-McCrary and Sapona redeeming all of the shares of a deceased employee and shareholder, Tommy Redding, and (2) Acme-McCrary and Sapona each sending a letter to shareholders indicating that the companies were exploring ways to redeem stock. (C. Simmons Aff. ¶¶ 13, 15.)

{58} Such limited activity by the Defendant Corporations did not create a future right of redemption for all the other shareholders. The Defendant Corporations never adopted a redemption plan and never set up a reserve to cover the expense. No other shareholders have appeared and testified that they expected either Mrs. Simmons's shares or their own shares to be repurchased upon their death. Other shareholders have died without their shares being redeemed and without any offer being made by Defendants or demand being made by the decedents' estates. When

---

[13] The Court recognizes that "expectation" evidence should not be limited to written agreements and therefore considers the history of corporate activity.

[14] It is unclear what that agreement would be under these circumstances. *See infra* ¶ 63.

Tommy Redding died, there was no expectation or demand. The boards of both Acme-McCrary and Sapona acted voluntarily in light of his age, employment, and young family.

{59} The court in *Royals* recognized that in certain circumstances a complaining shareholder may have a reasonable expectation of having their shares purchased at fair value. *See Royals*, 137 N.C. App. at 706, 529 S.E.2d at 519. However, such a finding would require other shareholders to have known or assumed the same. *Id.*

{60} In this case, there is no clear showing that the other shareholders knew or assumed that Mrs. Simmons expected her shares to be redeemed at fair value. The larger the number of shareholders, the more difficult it becomes to determine the expectations of every shareholder.[15] That difficulty is heightened where the majority of shareholders are not involved in the business, as is the case with the Defendant Corporations. Plaintiff does not offer any evidence of what the other shareholders knew about Mrs. Simmons's expectations or what their expectations were.[16] It would be fair to assume that few, if any, of the other shareholders had any personal knowledge of Mrs. Simmons's expectations.[17]

{61} In addition, the Court is troubled by the lack of any action on the part of Mrs. Simmons that would have put the boards of directors or management on notice of her expectations. There is nothing to show that Mrs. Simmons ever did anything to indicate to the Defendants or other shareholders that she had an expectation of redemption. To the contrary, when two of the Defendant Corporations offered her the right to tender her shares, she declined. (Allen Dep. 33:23–34:9.) Her alleged expectation that her shares in each of the Defendant Corporations would be readily transferable was first made known to the Defendants after her death. No evidence suggests that Mrs. Simmons ever communicated this expectation to any officer,

---

[15] The large number of shareholders and the absence of a controlling majority shareholder also signifies a departure from the family partnership environment and distinguishes this case from the typical *Meiselman* claim. *See supra* ¶ 47.

[16] In other *Meiselman* type cases, the expectation was one that was made known to the defendants or was understandable based on the size of the business and the participation in it by the complaining shareholder. However, *Meiselman* did not create new rights by estoppel in corporate relationships.

[17] Defendants were not in any position to know her financial situation or her estate planning needs as was the case in *Royals*. *See infra* ¶ 77 n.21.

director, or shareholder prior to that time. As the court in *Meiselman* explained, "[p]rivately held expectations which are not made known to the other participants are not 'reasonable.'" *Meiselman*, 309 N.C. at 298, 307 S.E.2d at 563.

{62} Even though the stocks at issue were her primary assets, Mrs. Simmons made no inquiry concerning the circumstances under which her shares would be purchased when doing her estate planning. She never asked Defendants how and when the shares would be purchased and what circumstances might prevent their purchase. If this were a negligent misrepresentation case, Mrs. Simmons would have been under a duty to make some inquiry to protect her expectations. If this were a breach of contract case, Mrs. Simmons would have had to provide some form of consideration for her redemption rights, and the contract would have had to have been mutually enforceable.

{63} Moreover, even if this Court were to conclude that Mrs. Simmons and all the shareholders of the Defendant Corporations did in fact have an expectation of redemption, that expectation was not reasonable under the circumstances of this case. In making this determination, the Court has considered the scope of the buyback expectation allegedly created. Did Sapona and Acme-McCrary create an expectation that any shareholder who died would have their shares repurchased at fair market value or was the expectation that when a shareholder died, those two companies would offer to buy back shares from all shareholders on a prorated basis?

{64} The only instance of a buyback from a decedent's estate was the purchase of shares from Tommy Redding's estate in 1997. (C. Simmons Aff. ¶¶ 15–17.) When Tommy Redding, an employee of Acme-McCrary, passed away unexpectedly at age forty, Acme-McCrary and Sapona purchased all of Tommy Redding's shares for the benefit of his estate and made tender offers to all of their other shareholders. (W.H. Redding, Jr. Dep. 63:13–15.) Up until that point there had never been a buyback from an estate in the ninety-year history of either company, which is the primary reason the number of shareholders had increased. When a shareholder died, his beneficiaries became owners.

{65}   If this one instance created a buyback expectation, then that expectation would be for a buyback that applied to all shareholders on a prorated basis.  An expectation of such a broad obligation on the part of the corporations, however, is not reasonable.  The companies had no plan in place and no reserve funds for financing such a broad buyback obligation.[18]  Their businesses were being severely challenged by foreign imports.  (*See* Defs.' Interrog. Answers at 12.)  They also had restrictions on their credit lines and faced the risk of having several large shareholders pass away at the same time.  Therefore, finding that the Defendant Corporations had created an expectation of a buyback applicable to all shareholders would have adverse consequences for the corporations.

{66}   A buyback of all minority shareholders at fair market value—as opposed to a valuation based on a discount for minority ownership—also is unrealistic.  There is no evidence that any other shareholder believed he or she had a similar right or interest.  There also is no evidence that Mrs. Simmons's expectation was personal to her.  Her expectation had to apply to all shareholders.  The directors could have faced stiff fiduciary duty challenges from other minority shareholders if they had decided to redeem Mrs. Simmons's shares without offering to redeem shares of all shareholders.  That fiduciary duty explains the tender offer to other shareholders in 1997 and 2000.

{67}   Moreover, the tender offer letters from Sapona and Acme-McCrary make no reference to estates or deceased shareholders.  They are limited time offers subject to maximum dollar limitations.  The offers are prorated among the shareholders.  They speak only of the directors' beliefs that it is "appropriate that shareholders be given the opportunity to liquidate their investment *from time to time*."  (Defs.' Br. Supp. Mot. Summ. J. Ex. A, B, C (emphasis added).)  The letters acknowledge the illiquidity of the shares, but do not constitute a promise to solve that problem for a deceased shareholder.[19]

---

[18] The companies could have afforded to buy back Mrs. Simmons's shares alone without a prorated buyback from other shareholders.

[19] There is nothing unusual about the illiquidity of the shares of the Defendant Corporations.  They suffer from the same lack of marketability that applies to almost every minority interest in a

{68} The case for requiring redemption of Mrs. Simmons's stock in Randolph Oil is even weaker. It is uncontroverted that Randolph Oil has never purchased shares for its own account from a deceased shareholder's estate. It also has never made a tender offer for shares. It only facilitated trades between shareholders. Therefore, the expectation argument applies differently to Randolph Oil.

{69} As was the case with the other two Defendant Corporations, Mrs. Simmons never participated in the management of Randolph Oil. She never communicated any expectation to Randolph Oil's management, and there was no way management or the other shareholders could have known of her expectation of having her shares in the company redeemed upon her death at fair market value.

{70} Plaintiff contends that its shares have been held captive. It draws the Court's attention to the fact that another shareholder or manager has sought to purchase Plaintiff's shares at less than fair market value and to minimal evidence of animosity between Mrs. Simmons's husband and Mr. Toladano. These two situations are evidence of oppression, if anything. And *Meiselman* plainly teaches that oppression is not the standard for determining rights and interests. It is applicable only when determining the need for protection.

3.

EQUITABLE DISCRETION

{71} *Meiselman* also requires the Court to consider the impact a dissolution order would have on *all* shareholders. *See Meiselman*, 309 N.C. at 297, 307 S.E.2d at 562 ("[O]nce the shareholder has established [that a right or interest has been contravened], the trial court . . . must exercise its equitable discretion and consider the actual benefit and injury to all of the shareholders."). In this case, the equities weigh strongly against judicial dissolution.

{72} Even though our dissolution statute provides a buy-out alternative (*see supra* ¶ 33), such an alternative is not always economically feasible. If, for some reason, one of the Defendant Corporations could not buy back Mrs. Simmons's

corporation whose shares are not publicly traded, and that illiquidity affects all shareholders, not just Plaintiff. Defendants have taken no coercive action to cause the illiquidity.

shares, the corporation would face involuntary dissolution. Dissolution would severely diminish the value of the other shareholders' ownership interest, and hundreds of employees could potentially lose their jobs. Dissolution also might impose significant tax burdens on the other shareholders.

B.

*ROYALS*

{73}   This Court conducted a *Meiselman* analysis in *Royals* and determined that dissolution was reasonably necessary for the protection of the rights and interests of the complaining minority shareholder. *Royals v. Piedmont Elec. Repair Co.*, 1999 NCBC 1 ¶¶ 39, 49 (N.C. Super. Ct. Mar. 3, 1999), http://www.ncbusinesscourt.net/opinions/1999%20NCBC%201.htm. That determination was affirmed on appeal. *See Royals v. Piedmont Elec. Repair Co.*, 137 N.C. App. 700, 710, 529 S.E.2d 515, 521 (2000).

{74}   Plaintiff seeks essentially the same relief sought by the plaintiff in *Royals*, redemption of a decedent's shares at fair market value. Plaintiff cites *Royals* for the proposition that a shareholder may have a reasonable expectation of receiving some sort of fair value for his shares of stock. (*See* Pl.'s Br. Supp. Mot. Summ. J. at 11.) What then distinguishes this case from *Royals* and justifies a different result? Each case is context and fact specific.

{75}   In *Royals* the deceased minority shareholder ("Glenn") had a reasonable expectation in receiving fair value for his shares based on a retirement planning arrangement with the company. This arrangement was part of the company's succession and retirement planning. *Royals*, 1999 NCBC 1 ¶ 40. Glenn originally expected the redemption to occur at a bargain price supplemented by a subsidized compensation. *Id.* However, when the arrangement was modified to eliminate the compensation component, the parties' expectations changed. *Royals*, 137 N.C. App. at 707, 529 S.E.2d at 519. Glenn then expected to have his shares in the company redeemed at fair value rather than at a bargain price. *Id.*

{76}   This Court and the North Carolina Court of Appeals found an expectation and therefore a right of redemption in *Royals*. That right arose from a history of

retiring employees and shareholders selling their stock to fund their retirement in a business with just a handful of shareholders, all of whom worked in the business.[20] No such history of succession is present in this case.

{77} Particular facts concerning the business also are significant. For example, up until Glenn's death all shares were owned by individuals who worked actively in the company and the business had been run like a partnership. Glenn had devoted most of his adult life to the business and had worked closely with management and his son Buck, the majority shareholder.[21] Mrs. Simmons, on the other hand, never worked for any of the Defendant Corporations and never worked closely with their management or majority shareholder.

{78} In addition, the company in *Royals* only had a handful of shareholders,[22] whereas the Defendant Corporations had twenty-five to eight-one shareholders. The number and composition of the non-complaining shareholders are important considerations. *But see supra* ¶ 50. The Defendant Corporations in this case each had a large number of shareholders. There could be a wide variance in interests among the shareholders—some might welcome a prorated buyback while others might find it financially disadvantageous.

{79} There also were significant elements of oppression present in *Royals*. A single majority shareholder controlled the business. That shareholder knew about his father's financial needs and took steps to adversely affect his father's financial condition by terminating his father's retirement consulting arrangement and by making a less than book value offer for his father's stock. He excluded the trustee of his father's estate (who represented thirty-nine percent of the shares) from any involvement in management. He also withheld information about the company and barred the trustee from the premises. This behavior raises two concerns articulated

---

[20] For example, when Short's father retired from the business, he sold his shares to his son to fund his retirement. Then when Short retired from the business, he sold the majority of his shares to Buck to fund his retirement.

[21] Glenn, Buck, Short, and Short's father worked closely together over the years and knew each of their respective financial resources and plans.

[22] Of the 990 shares outstanding, the complaining minority shareholders owned 434 shares, Buck owned 506 shares, Short owned 1 share, and an employee named Steve Coe owned 49 shares. *Royals*, 1999 NCBC 1 ¶¶ 7, 9.

in *Meiselman*: acrimonious relationships in small family-owned businesses and the loss of a clear expectation of employment, compensation, and benefits based upon decades of involvement in the business. None of these concerns are found in this case. *See discussion supra* Part VI.A.1.

## C.
## FUTURE CLAIMS

{80} The Court also has considered the possibility of future redemption claims. Are the Defendant Corporations under a duty to offer to purchase similar amounts of stock from other shareholders or just to buy Mrs. Simmons's shares? While the Defendant Corporations may be able to afford such a redemption plan from a cash standpoint now, it would not be practical for them to agree on a redemption plan that did not take into account the future financial situation of the companies.

{81} The Bank argues that the Defendant Corporations can protect themselves from future redemption claims by disavowing any intention to redeem stock of any other shareholder in the future, thus eliminating a reasonable expectation on the part of other shareholders. However, under that scenario, Mrs. Simmons's estate would receive a benefit no other shareholder receives. The Court doubts that a current disavowal will deter the estate of any other shareholder from suing if a right to redemption is recognized in this case.

## VII.
## CONCLUSION

{82} The Court concludes that Plaintiff is not entitled to involuntary dissolution of any of the Defendant Corporations under section 55-14-30(2)(ii). Mrs. Simmons did not possess an enforceable right or interest based upon a *reasonable* expectation (shared by *all* shareholders) that her ownership in the Defendant Corporations would be redeemed at fair value upon her death. Because the Court has found no enforceable right or interest, it need not address the alternative relief provided for under section 55-14-30. If an issue arises in the future with respect to the payment

of dividends, those rights can be protected under other statutes and equitable principles.

{83}   Therefore, based on the foregoing, it is hereby ORDERED, ADJUDGED, and DECREED that Defendants' Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED.

SO ORDERED, this 22nd day of June, 2010.

Table 2: Dividend History for Elizabeth M. Simmons

| Year | Sapona | | Acme-McCrary | | Randolph Oil | |
|---|---|---|---|---|---|---|
| | Dividends Per Share | Total Dividends | Dividends Per Share | Total Dividends | Dividends Per Share | Total Dividends |
| 1997 | $2.70 | $56,565.00 | $1.75 | $25,285.75 | N/A | N/A |
| 1998 | $2.70 | $56,565.00 | $1.75 | $25,285.75 | N/A | N/A |
| 1999 | $2.70 | $56,565.00 | $1.40 | $20,228.60 | $5.00 | $4,075.00 |
| 2000 | $2.70 | $56,565.00 | None | $0.00 | $5.00 | $4,075.00 |
| 2001 | $2.70 | $56,565.00 | None | $0.00 | $5.00 | $4,075.00 |
| 2002 | $2.55 | $53,422.50 | None | $0.00 | $4.00 | $3,260.00 |
| 2003 | $2.70 | $56,565.00 | None | $0.00 | $3.00 | $2,445.00 |
| 2004 | $2.70 | $56,565.00 | $0.25 | $3,612.25 | $3.00 | $2,445.00 |
| 2005 | $2.70 | $56,565.00 | $0.75 | $10,836.75 | $3.00 | $2,445.00 |
| 2006 | $2.70 | $56,565.00 | $1.00 | $14,449.00 | $3.00 | $2,445.00 |
| 2007 | $2.75 | $57,612.50 | $1.00 | $14,449.00 | $3.00 | $2,445.00 |
| 2008 | $3.60 | $75,420.00 | $1.40 | $20,228.60 | $3.00 | $2,445.00 |

Sapona Aff. ¶ 7; Acme-McCrary Aff. ¶ 7; Randolph Oil Aff. ¶ 6; Sapona Report at 4; Acme-McCrary Report at 4; Randolph Oil Report at 4.